## J. P. HORBACH v. THE STATE.

1. EVIDENCE OF GENERAL CHARACTER OF DECEASED—MURDER.— In a prosecution for murder the general character of the deceased may be proved when it would serve to explain the actions of the deceased at the time of the killing, but the actions it would serve to explain must first be proved before permitting proof of the character of deceased, and if no such acts are proved, its rejection is not error.

2. EVIDENCE OF THREATS, WHEN A PROPER SUBJECT OF EXPLANATION BY THE COURT.—By the code threats are admissible as independent evidence, without first establishing a predicate for their admission by proof of acts done at the time of the killing, to which they might give additional force, but the effect of such evidence may be subsequently explained away and destroyed by the charge of the court in the absence of evidence tending to prove such acts.

3. CHARGE OF COURT.—Before admitting evidence of the general character of the deceased there must be a predicate established, by evidence already submitted, tending to prove threats of the deceased, or some act done by him at the time of the killing which it would aid to explain. When such evidence is admitted, it would be proper and not charging on the weight of evidence for the court to explain

to the jury the object of its admission as auxiliary and explanatory of the threats or acts to which it was pertinent, and to be not of itself independent evidence of a defense.

4. JURY, HOW IMPANELED.—In impaneling a jury in a capital case the names of the persons summoned should be called in the order they stand upon the list, and when found qualified they are to be challenged either peremptorily or for cause, or accepted severally, as each one is determined by the court to be a qualified juror, which is to be continued one by one until the jury is fully formed to the number of twelve. No law or established practice under the law is known which sanctions the peremptory challenge of a juror by either party in such case after the juror is accepted and impaneled, whether the jury be full or not, though there may be discretion in the court for excusing or setting aside a juror after he is thus selected for good cause shown at the time why he cannot or ought not to serve on the jury.

APPEAL from Dallas. Tried below before the Hon. Silas Hare.

The facts of this interesting case will be found carefully stated in the opinion of the Chief Justice.

*Good & Coombes,* for appellant.

1. The opprobrious epithets and reaching for a weapon were "acts," and from these it did "reasonably appear" that it was "the purpose and intent" of deceased to kill, and if to kill, to murder. (Paschal's Dig., art. 2226.)

2. "The killing must take place while the person killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit such offense." (Paschal's Dig., art. 2225.)

Why the former paragraph should require "a *reasonable appearance* from acts," and this "that the acts done must show *evidently*," &c., in order to justify, we are at some loss to determine, but we insist that the whole manner, words, and act of deceased, for the reason above given, showed that he "was in the act," and it was his "intention" at the time to take life, and these can be accounted for on no other hypothesis.

3. " The attack upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation or fear of death or some serious bodily injury." (Paschal's Dig., art. 2230.)

It will not be questioned that there was an "attack upon the person" of appellant.   Was this such as " produced" *on his mind* " an expectation or fear of death or serious bodily injury," and was such expectation or fear " reasonable ?"

These inquiries must be determined from appellant's standpoint with all the facts and circumstances that then surrounded him, bearing in mind that the language and attack of deceased were sudden and unprovoked, the want of time for cool reflection, and the impression upon a bystander, Wilson, that Thomas intended to shoot.   (Shorter *v*. The People, 2 Com., (N. Y.,) 193 ; Harrigan & Thompson's Cases of Self-defense, 256, 266 ; Logue *v*. Commonwealth, 2 Wright, (Pa.,) 265 ; H. &. T. Self-defense, 269, 276 ; Maher *v*. The People, 24 Ill., 241 ; H. & T. Self-defense, 290, 292 ; Rapp *v*. Commonwealth, 14 B. Monroe, 615 ; H. & T. Self-defense, 293, 297 ; Philips *v*. Commonwealth, 2 Duval, 328 ; H. & T. Self-defense, 383, 388 ; Bohannon *v*. Commonwealth, 8 Bush., (Ky.,) 481 ; H. & T. Self-defense, 395, 405 ; Pridgen *v*. The State, 31 Tex., 420.)

The above cases are not referred to because directly in point, in fact but two of them, Phillips and Bohannon, in anywise approach it, but to show the opinions of different judges in regard to *acting upon appearances of danger*, their reasonings and conclusions under laws more stringent than our own.

The fifth, sixth, and seventh assignments are to rulings excluding evidence that deceased was in the habit of carrying deadly weapons and his character when drinking. This testimony was necessary to explain the *extent* of the " expectation or fear produced, and whether it was reason-

able " or not.    If he did not carry weapons, and was quiet
and peaceable when drunk, appellant had no cause for fear
of death or serious injury, and the shooting was murder.
If he habitually carried them, was violent and dangerous,
his right hand to the rear after the abuse and blows was a
signal of danger no man could disregard, and the shooting
justifiable.    The character and habits of deceased form an
important element of the *res gestœ* in such cases, and should
have been admitted.    The decisions are conflicting, but
the weight of authority sustains our position.  (Cases *supra;*
Williams *v.* The State, 3 Hiesk. Tenn., 376; 1 Green's Crim.
Rep., 255, 267; Franklin *v.* The State, 29 Ala., 14; The State
*v.* Robertson, Addison, 246 ; Cotton *v.* The State, 31 Miss.,
504; Harrigan & Thompson's Leading Cases Self-defense,
478–487; Ib., 487–492; and last, but not least, Thomas *v.*
The State, 40 Tex., 41–43.)

*Hancock, West & North,* also for appellant, insisted that
the jury was not properly formed, and argued ably and at
length that error was committed in refusing to permit the
defense to prove, under the circumstances shown, the fact
that deceased had been in the habit of carrying deadly
weapons shortly before his death, and his quarrelsome and
dangerous character when intoxicated, citing Quesenberry
*v.* The State, 3 Stewart & Port., 315 ; State *v.* Tackett, 1
Hawks, 210 ; Wright *v.* The State, 9 Yerger, 342.

*George Clark, Attorney General,* for the State.

ROBERTS, CHIEF JUSTICE.—The defendant was indicted
for the murder of H. K. Thomas, found guilty of murder
in the second degree, and his punishment assessed at six
years in the State penitentiary.

The facts necessary to be mentioned to present the errors
on the trial complained of were that Horbach and Thomas
were perfectly friendly up to the time of the difficulty,

which happened about 11 o'clock at night, in a "sample room" in the city of Dallas, where and when there were present Boyle, one of the proprietors, and Duckworth, the bar-keeper, both of whom were behind the counter; Shock and Wilson, who were outside of the counter, as were also both Horbach and Thomas, both of whom were somewhat intoxicated and had taken, together with others, two drinks of spirits not long before the difficulty arose. Four of them had just played a game of pool, in which Thomas had lost, and treated the others. Upon asking his bill of the bar-keeper, he was told that he owed for two rounds of drinks, Horbach being then at the front of the store. Thomas said he owed no such a damned thing. The bar-keeper said, "All right, Harvey;" and Thomas paid for one round of drinks, and said if any one said he owed for two rounds he was a damned liar. The defendant then came in, singing and dancing, with a watering-pot in his hand, and put it on the counter, when Thomas asked him if he (Thomas) owed for two rounds; and Horbach said, "Yes." Thomas said, "It is a God damned lie," and taking the watering-pot, threw it down violently and mashed it. Up to this point there is no material difference in the testimony of the witnesses, but as to the balance there were some differences, which are attributable, partly at least, to two being behind the counter and two being in front of the counter. That of the two in front, Shock and Wilson, was most favorable to the defendant, and was, in substance, that Thomas told Horbach that "he was a damned lying son of a bitch," when Shock stepped up and told him that he (Shock) owed for the drinks. Thomas replied, "That is too thin," and told him to go away; and turning to the defendant, told him again, whoever says that he owed for two rounds, is a damned lying son of a bitch, at the same time gesticulating violently with his right hand, touching or striking Horbach in the breast. Horbach said, "Then you don't owe it?" Thomas again said to Horbach, "You

are a damned lying son of a bitch," still gesticulating as
before in a violent, angry manner.   Horbach said, "What
do you mean?" perhaps twice, Thomas still repeating his
accusations and gesticulations, when finally, stepping back
his right foot, threw his right hand behind him, pushing
back the skirt of his coat, (one of the witnesses says as if
to draw a pistol,) when instantly Horbach presented his
pistol with both of his hands, and firing, shot Thomas in
the head, and killed him.   Shock says that, being behind
Thomas, he was shaking his head at Horbach.   Wilson
says that, being off to one side, he dodged and sat down,
when he saw Thomas put his hand behind him.   Bogle
says that during the altercation he went into the front
room, turned down some lights, came back, put some
money in the safe, went behind the bar, and was talking
to the bar-keeper about closing up, when the firing took
place at the south end of the counter, the said witness
being at the north end, and the counter being so high that
he could not see the movement of the parties' hands in
front of it.   Shock went for a doctor.   Wilson left the
house as did the defendant, who was arrested that night in
Wilson's room.   There was evidence that Bogle and Duck-
work were more friendly to Thomas than to Horbach.
The doctor came and found no weapons on Thomas, and
there was no further evidence as to whether he had weap-
ons or not when he was shot.

There is no intention here to give the least intimation
of opinion as to the weight of this evidence, as establishing
one conclusion or another in reference to the guilt or in-
nocence of the defendant.   It is collated simply to show
that there was evidence tending to prove one of two con-
clusions leading to different results, either that Horbach
shot Thomas from a sudden motive of revenge for an un-
provoked and gross insult, or under the belief that the
gross insult was then being followed up by the act of mak-
ing a deadly assault upon him with a weapon, endangering

his life.  The facts tending to the establishment of the latter conclusion (to what extent it is immaterial to consider now) were that Thomas, having a dispute with the bar-keeper about his liquor bill, became angry, and without any apparent cause turned the controversy about it from the bar-keeper to Horbach.  The bar-keeper, Shock, and Horbach, all tried to pacify him, and let him have his own version of the matter.  Still he persisted in fastening the controversy on Horbach, who was not concerned in it and was not even present when it commenced.  Horbach treated the matter lightly at first, and when all the means that were tried could not divert him from making the issue with Horbach, he commenced treating the matter seriously, and asked Thomas what he meant.  Thomas stepped back his right foot, and threw his hand behind him as if to draw a pistol.  It may be a significant fact, as tending to show the known character of Thomas, that the persons there, seeing the matter becoming serious, did not interfere, except that Shock, having been once rudely repulsed by Thomas, stood off at some distance shaking his head at Horbach.  This may bear two constructions, either that they did not think it necessary to interfere, or that they did not deem it consistent with their own safety to interfere with Thomas any further than had been done.

For the purpose of adding still further weight to the evidence, tending to the conclusion that Horbach acted under the belief and had reasonable grounds, from the words and acts of Thomas then said and done, to believe that Thomas was in the act of making a deadly assault upon him with a weapon.  The defendant, by his counsel, sought to prove by questions to witnesses that Thomas was in the habit of carrying deadly weapons, and that Thomas when intoxicated was a quarrelsome and dangerous man.  The questions being objected to, were not allowed to be answered, to which ruling of the court defendant excepted, which appears in bills of exceptions in the record.

The question is, was such evidence admissible for such a purpose as an element of defense.

"Evidence in legal acceptation includes all the means by which an alleged matter of fact, the truth of which is submitted to investigation, is established or disproved.

"By competent evidence is meant that which the very nature of the thing to be proved requires as the fit and appropriate proof in the particular case."

The thing sought to be proved in this case is, that Horbach had reasonable grounds to believe, and did believe, that Thomas then intended and was in the act of then attempting to kill him by the use of a weapon. Now, supposing it to be proved that Thomas, being enraged and pressing the unprovoked quarrel upon Horbach until it had become serious, and had arrived at a point where Thomas would either have to recede or follow it up with increased malignity, and just at that juncture he steps back and throws his right hand behind him, what other facts would be required as peculiarly fit and proper to be known by Horbach to induce that reasonable belief? Certainly the most fit and appropriate additional facts that he could possibly know tending to prove such reasonable belief would be that Thomas had a pistol on his person back where he put his hand, and that he was a man that would use it when mad and intoxicated, and would not likely back down from a difficulty that he had himself provoked. If Thomas was in the habit of carrying a pistol where he put his hand it was not improbable that his friend, Horbach, as well as others, knew it, and might infer from the motion of his hand the intention to draw it; and if his general character was that of a dangerous man when aroused with anger and excited with drink, Horbach might infer that Thomas intended to use the pistol on him when drawn. On the other hand, if Horbach knew that Thomas' general character was that of a quarrelsome man, with no force of character, not vicious

and destructive in his nature, not likely to use weapons if he had them, and not in the habit of carrying them, then the inference might not be reasonable from his conduct that he intended then to draw and use a pistol.

Thus is it shown that these very facts, Thomas' character for violence and habit of carrying arms, with Horbach's knowledge of them, might determine his guilt or innocence in acting as promptly as he did. His intoxication, his anger, his persistently pressing the difficulty on Horbach without cause, his violent character, and his habit of carrying weapons, would all be appropriate and fit facts, if they existed, to throw light upon and give significance to his movement in stepping back and throwing back his hand. Taken separately and in the abstract, they may be meaningless, indifferent, and immaterial, but taken together they may be pregnant with meaning, as shown by the conduct of the two witnesses, Wilson and Shock, who saw Thomas' motion of his body and of his hand. A man's character for violence, dependent upon his irascible temper, overbearing disposition, and reckless disregard of human life, is as much a part of himself as his judgment and discretion, his sight or hearing, his strength, his size, his activity, or his age, any one of which may become a material fact to give a correct understanding of his conduct and the intention with which an act is done by him, and are therefore part of the *res gestæ* when pertinent to the act sought to be explained. Their office in evidence is adjective, as auxiliary to a substantive fact to which they are pertinent, and without which they are irrelevant and immaterial. They are helps to the understanding in construing human conduct. The mind cannot reject or disregard them. They, and all like helps, ever have been, and ever will be, elements in the formation of belief as to what a man designs by an act to which they are pertinent. Practically we know that men generally, who are assailed with violence, act in defending themselves with promptness and force in

proportion to the violent and desperate character of their assailant. It behooves them so to do for their own safety, because it is known that such men who usually fight only with weapons, and usually have them ready for use, are not to be trusted to get an advantage in the combat.

If, then, the character of the assailant in any case has helped to form a reasonable belief in the mind of the assailed that his life was then in danger, when the acts alone would fail to do it, the jury should in some way be informed of the character of the assailant, as well as of his acts, to enable them to understand that the belief was a reasonable one. Otherwise he might act in his defense on such reasonable belief, and the jury, not helped by a knowledge of the assailant's character to understand the import of his acts, of which they were informed, would find him guilty of murder, because of his having acted without reasonable grounds for believing that his life was then in danger, when in fact he had such reasonable grounds of belief, did believe it, and acted on such belief.

This being sometimes an important fact necessary to be known by a jury to enable them to come to a proper conclusion as to the state of mind of the accused just at the time when he killed the deceased, how and under what circumstances is it admissible in evidence? It is laid down as the rule at common law, as practiced in England and most of the older States of the American Union, that it must be made to appear, if at all, in the transactions immediately connected with the killing as part of the *res gestæ*, as it is termed, and to be deduced therefrom rather than to be proved as a distinct fact.

In an old-settled country where there is little change of population, this fact would generally be known to a jury without being proved as a distinct fact, whereas in newly-settled countries it might not be. Formerly it was the rule to get jurors from the vicinage who knew the parties and the transaction. Now, the very opposite is the rule.

There are various other reasons, arising out of the state of society and habits of the people in different countries and at different periods, which would make it important that this fact when pertinent should be made to appear as a distinct fact, as explanatory of the acts and intentions of the parties concerned, in order to arrive at the truth.

In an early case in North Carolina it was said, in speaking of the common law, (in a case where it was held that the proof of the character of the deceased for violence was admissible as a distinct fact,) that it is "a system which adapts itself to the habits, institutions, and actual conditions of citizens, and which is not the result of the wisdom of any one man, in any one age, but of the wisdom and experience of many ages of wise and discreet men." (State *v.* Tackett, 1 Hawks' L. & E. R., (N. C.,) 217.)

In an early case in Alabama evidence of the general character of the deceased was held to be admissible. Chief Justice Lipscomb, (who so long adorned our court also as Associate Justice,) in delivering the opinion, said in very strong language, "If the deceased was known to be quick and deadly in his revenge of insults, that he was ready to raise a deadly weapon on every slight provocation; or, in the language of counsel, his 'garments were stained with many murders,' when the slayer had been menaced by such an one, he would find some excuse in one of the strongest impulses of our nature in anticipating the purposes of his antagonist. The language of the law in such a case would be, obey that impulse to self-preservation even at the hazard of the life of your adversary." (Quesenberry *v.* The State, 3 Stewart and Porter (Ala.) Rep., 315–6.) In the same case it is said that "There can be no doubt but that when the killing has been under such circumstances as to create a doubt as to the character of the offense committed that the general character of the accused may sometimes afford a clue by which the devious ways by which human action is influenced may be threaded and the truth ob-

tained." These views of the law are quoted and adopted with numerous reasons for their correctness by Justice Lumpkin in the case of Keener v. The State, 18 Ga., 221; Monroe v. The State of Georgia, 5 Ga., 90.

In the case of the State of Missouri v. Keene, 50 Mo., 358, the court say, that "Where a homicide is committed under such circumstances that it is doubtful whether the act was committed maliciously or from a well-grounded apprehension of danger, it is very proper that the jury should consider the fact that the deceased was turbulent, violent, and desperate, in determining whether the accused had reasonable cause to apprehend great personal injury to himself." This was said in reversing a conviction for murder, because the court had excluded evidence offered that the deceased was a quarrelsome, dangerous, and desperate man, and in the habit of carrying weapons, as was done in this case. (See also The State v. Hicks, 27 Mo., 590.)

The same doctrine was announced in the State of Minnesota in the case of The State v. Dumphey, 4 Minn., 446, and also in the State of California, 10 Cal., 309, in the case of the People v. Murray.

In the case above quoted from Minnesota it is said: "The character of the deceased *per se* can never be material in the trial of a party for killing, because it is as great an offense to kill a bad man as it is to kill a good man, or to kill a quarrelsome and brutal man as it is to kill a mild and inoffensive man.

"The principle upon which this testimony is alone admitted arises from some peculiar condition in which the facts of the killing leave the crime. If the facts as established free the case from uncertainty and doubt, and leave the killing an act of premeditated design on the part of the defendant, the quarrelsome character of the deceased can in no manner change the nature of the offense; but if circumstances surround the transaction which leave the intention of the defendant in committing the crime doubt-

ful, or evenly balanced, or in any manner indicate provocation on the part of the deceased, testimony of the quarrelsome character of the deceased would then become sufficiently part of the *res gestæ* to be admitted to explain or throw light upon the matter." (State *v.* Dumphey, 4 Minn., 445–446.)

It may be deduced from these authorities that the general character of the deceased for violence may be proved when it would serve to explain the actions of the deceased at the time of the killing; that the actions which it would serve to explain must first be proved before it would be admissible as evidence; that if no such acts were proved as it would serve to explain, its rejection, when offered in evidence, would not be error; and that, if rejected when a proper predicate has been established for its admission, it is held to be error. (See Irvin *v.* The State, decided this Term.) This results in what has been previously attempted to be developed, that the general character of the accused for violence should be allowed to be proved, not as a substantive fact, in whole or in part abstractly constituting a defense, but as auxiliary to and explanatory of some fact or facts proved to have occurred at and in connection with the killing, which tend to establish a defense when thereby aided by furnishing reasonable ground for the belief on the part of the slayer that he is then in immediate and imminent danger of the loss of his life from the attack of his assailant. It is observable in most of these cases that it is said that the evidence of character for violence is admissible in a doubtful case. It can hardly be meant by this that it is admissible only in a doubtful case of guilt; for if that is doubtful, there is no need of proof of character or anything else to help out the defense. (1 Whar. Crim. Law, sec. 644.) The explanation, it is submitted, is that the person killing is presumed to have committed murder by the act of killing, and in arraying the facts to establish that he acted in self-defense, if an act of the de-

ceased at the time of the killing is of doubtful import, or is otherwise of a character that it would be explained and construed more favorably for the accused by adding to it the proof of the character of the deceased for violence, then such proof is admissible. (1 Whar. Crim. Law, sec. 641, and cases cited.)

The same rule would apply to the proof of the deceased's habit of carrying arms when pertinent. (*Ib.*)

It would be easy to cite authorities opposed to the admission of such proof upon any condition or under any circumstances as part of a defense. (3 Greenl., sec. 27, and note; 1 Whart. Crim. L., sec. 641, and note.)

It is obvious, however, that in all the cases where it is not allowed to be proved as a distinct fact, its importance as part of the defense is fully appreciated and acted on by courts and juries where the transactions at the time of and connected with the killing develop and bring to light the violent character of the deceased.

Our Criminal Code provides for the admission of the proof of the general character of the deceased, as a violent or dangerous man, when it has been proved that he had previously made threats against the life of the defendant, which threats are declared to be admissible, but "not to be regarded as affording a justification for the offense, unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threat so made." (Paschal's Dig., art. 2270.)

Here the principal object is to provide for the admission of threats, and incidentally thereto is permitted the proof of the violent character of the deceased to give force to them, and both together, when proved, serve only to explain the object of an act done by the deceased at the time of the killing.

The main object of this provision of the code was to settle a long-continued controversy in the courts of this State as to whether previous threats should be admitted at

all, and if admitted, what their force and effect should be; and whether or not a predicate should be first established for their admission by the proof of some act of the deceased which they would give point to and explain.

This affirmative provision for the admission of the proof of the character of the deceased, as a dependent incident to threats that have been admitted to be proved, should not be held to operate as an exclusion of the proof of character in any and all other instances wherein it might be equally applicable and pertinent.

In providing for the admission of previous threats it simply insured also the admission of that which was necessary to give them their proper weight and force, without prescribing anything, either for or against the admission of the proof of the violent character of the deceased, in aid of any other fact besides threats.

This provision of the code, it is believed, is a re-enactment of the rules relating to threats, as adopted and practiced as part of the common law in this State before the adoption of the Penal Code. (Lander *v*. The State, 12 Tex., 474, 484.)

If our laws sanction the proof of the violent character of the deceased in aid of threatening words, it is difficult to see why it should not be equally allowed to be proved in aid and explanation of threatening acts done by the deceased at the time of the killing.

It is scarcely necessary to go into an explanation of the condition of things in this country, which imperatively requires the admission of the proof of the character of the deceased for violence, in order to attain the ends of justice in the administration of the criminal law. It is well and generally known that there are some violent and dangerous men in this country, who are in the habit of carrying pistols belted behind them and in their pockets, who never think of fighting in any other way than with deadly weapons, who are expert in using them, and who, especially

when intoxicated, bring on and press to the extreme of outrage their deadly rencounters for causes and provocations that would be regarded as utterly trivial by peaceable men, and that if one of such persons while engaged in an angry altercation should suddenly step back and rapidly throw his hand behind him it might readily be understood by those who saw it to mean that he was in the act of drawing a pistol to use it. The same act by one of the great mass of our peaceable citizens who are not in the habit of carrying weapons would suggest no such thought, and in such case the pistol would have to be drawn and exhibited before any such thing would be conceived, unless there had been some very extraordinary provocation.

This state of things here is a substantial reality, well known and ostensible to the perception of every one at all familiar with the subject, and men act upon it, and are compelled to act upon it, in defending themselves from deadly assaults.

It is true the law requires a party killing to act under the responsibility to himself of acting soon enough to save himself from the loss of life or from serious bodily injury, such as mayhem, on the one hand, and on the other the risk of exercising firmness and discretion to wait long enough until some act is done by the deceased at the time of the killing by which the jury trying the case will be satisfied, considering all the surrounding circumstances and the parties concerned, that the defendant had reasonable grounds to believe, and did then believe, that he was then in imminent and impending danger of being murdered or maimed by his assailant. (Paschal's Dig., art. 2226.) And, although the attack may be unlawful and violent, if the act done by deceased indicated a " less degree of personal injury than killing and maiming," then, before the killing can be fully justified or excused, it must be shown that " all other means were resorted to for the prevention of the injury, and the killing must take place while the

17

person killed is in the very act of making such unlawful and violent attack." (Paschal's Dig., art. 2228.) This distinction and difference in the rule as made by our code, depending upon the degree of injury intended by the deceased as manifested by his acts, is very important practically to be observed.

It may avoid repetition by noticing here that this distinction was not properly observed in the otherwise very excellent charge of the court below, which is as follows: " The defendant may also justify himself in the killing by evidence showing: 1st, that the deceased made an unlawful and violent attack upon him; 2d, that the attack so made was of such a nature as to have produced in the mind of this defendant a reasonable expectation or fear of death or some serious bodily injury; 3d, that this defendant resorted to all other means to prevent the injury; 4th, that deceased was killed while in the very act of making such unlawful and violent attack. And unless all four of these propositions affirmatively appear in evidence the defendant cannot be justified on the ground of an unlawful and violent attack upon his person."

The second proposition above quoted is not contained in the article of the code to which the other three relate. (Art. 2228, Paschal's Dig.) By this article, 2228, it is intended to provide the rule that where any other unlawful and violent attack is made than one in which the acts of the deceased manifest the intention to murder or maim, (or to commit rape, robbery, arson, or theft at night,) defendant is required to resort to all other means before killing his assailant for the prevention of the injury, because in such an attack it is presumed that there may be time and opportunity to resort to other means. But, as provided for under the preceding article, 2226, where at the time of the killing " some act has been done by the deceased showing evidently an intent to commit such offense," (murder or maiming,) then and there, in that event, the party thus attacked need

not resort to other means before killing his assailant, because it is presumed in such a case that the party's safety depends upon his prompt action in killing his adversary. Thus, when an unlawful and violent assault is committed, the degree and character of injury intended by the assailant, as then indicated by his acts then done, is made the test of whether the party attacked may at once kill his assailant or must resort to all other means for the prevention of the injury before killing him. This confusion from blending the two rules might have been obviated by giving the 3d charge asked by defendant's counsel, which was refused by the court only upon the ground that it was deemed to have been "substantially given."

To return to the evidence excluded, it is proper to notice, on account of the intimate relations between threats and the general character of the deceased, that by our code threats are admissible as independent evidence without first having established a predicate for their admission by the proof of acts done at the time of the killing, to which they might give additional force, subject to having their effect as evidence subsequently explained away and destroyed by the charge of the court in the absence of evidence tending to prove such acts.

In the case of the proof of general character of the deceased there must be a predicate established by evidence already submitted tending to prove threats of the deceased, or some act done by him at the time of the killing, which it would aid or give force to, as heretofore explained; and when admitted it would be proper and not charging on the weight of evidence for the court to explain to the jury the object of its admission as auxiliary and explanatory of the threats or acts to which it was pertinent, and to be not of itself independent evidence of a defense.

The evidence exhibiting the acts of the deceased at the time of the killing constituted a predicate for the admission of the proof of the general character of the deceased

as a violent and dangerous man, and that he was in the habit of carrying weapons, and upon that ground such proof should have been admitted.

There is also a bill of exceptions in the record by the defendant as to the ruling of the court in the selection of the jury, which recites the facts as follows:

"After the State had passed severally upon Mitch Gray, R. H. Linsey, and James H. Davis, and before said jury had fully been made up, the court permitted the district attorney to challenge each of said jurors peremptorily and had them to stand aside, to which defendant excepts;" to which the judge annexed the following explanation in giving and signing the bill of exceptions, to wit: "the ruling of the court was, that the State or defendant could challenge any juror, although accepted, when a new juror was chosen, until their challenges respectively were exhausted."

Upon the trial of a capital offense a special *venire facias* is issued for persons, not less than thirty-six nor more than sixty, for the purpose of forming a jury. (Paschal's Dig., art. 3016, and following.)

It is further provided that, "in forming the jury, the names of the persons summoned shall be called in the order they stand upon the list, and if present, shall be tried as to their qualifications, and unless challenged, shall be impaneled." (Paschal's Dig., art. 3024.) By this we understand that they are to be challenged, either for cause or peremptorily, severally as each one is determined by the court to be a qualified juror, which is to be continued one by one until the jury is fully formed to the number of twelve. We know of no law or established practice under the law which sanctions the peremptory challenge of a juror by either party when thus placed on the jury, whether it is full or not. There may be discretion in the court for excusing or standing aside a juror after he is thus selected for some good cause shown at the time why the

juror cannot or ought not to serve on that jury. We do not think, therefore, that the mode of selecting the jury that was adopted in this case is warranted by the law of this State.

For the several errors that have been pointed out, and particularly for that of excluding the evidence offered to prove the general character of the deceased for violence, and that he was in the habit of carrying weapons, the judgment must be reversed and the cause remanded.

REVERSED AND REMANDED.