·[No. 1577.]

## NEEDHAM BRANCH v. THE STATE.

1. MURDER—INDICTMENT—ARREST OF JUDGMENT.—See the statement of the case for an indictment for murder, held, sufficient; wherefore a motion in arrest of judgment was properly overruled.

2. SAME—PROOF OF CHARACTER OF THE DECEASED.—The rule laid down in *Horbach's* case, 43 Texas, 242, defining the circumstances under which proof of the general character of the deceased may be put in evidence by a defendant upon trial for murder, cannot be restricted to the one act of seemingly attempting to draw a pistol or other weapon. The reason of the rule applies with equal force to any act reasonably indicating a present purpose on the part of the person slain to kill or to do some serious bodily injury to the slayer. See the opinion *in extenso* for an elaboration of the question, and for evidence *held* admissible under this rule.

3. PRACTICE—EVIDENCE.—Bill of exceptions to the reception of evidence, over objection, must be embodied in the transcript; otherwise this court will not revise the action of the court below.

4. SAME—CHARGE OF THE COURT.—Where evidence of a particular nature is admissible for but one purpose, and has been admitted for that one purpose (of impeaching a witness), the court should instruct the jury that they are authorized to consider it for that purpose only.

5. SAME—SELF-DEFENSE.—Note in the opinion a charge upon the subject of self-defense, *held* error, and also a requested charge, presenting the converse of the principle as it was charged by the court, which requested charge was erroneously refused. Note, also, a special charge upon the right of one person to interfere and kill, in order to prevent the deceased from killing another, *held* erroneously refused.

. APPEAL from the District Court of Shelby. Tried below before the Hon. A. J. Booty.

The first head-note refers to the indictment which explains the nature of this prosecution. The charging part reads as follows: "That Needham Branch, on the eleventh day of September, 1882, in the county of Shelby, and State of Texas, in and upon the person of one Bill Stewart, in the peace of God and in said State of Texas then and there being, unlawfully, feloniously, and of his deliberately premeditated malice aforethought, an assault and battery did make, and the said Needham Branch, with a certain pistol, which said pistol was then and there a deadly weapon, and the said pistol being then and there loaded

and charged with gun powder and divers leaden bullets, then and there feloniously, wilfully, and of his deliberately premeditated malice aforethought, did discharge and shoot off, to, against and upon the said Bill Stewart, and the said Needham Branch, with the leaden bullets aforesaid, out of the pistol aforesaid, then and there by the force of the gunpowder aforesaid, by the said Needham Branch discharged and shot off as aforesaid, then and there feloniously, wilfully, and of his deliberately premeditated malice aforethought, did strike, penetrate and wound the said Bill Stewart, in and upon the breast of the said Bill Stewart, giving the said Bill Stewart, with the leaden bullets aforesaid, so as aforesaid discharged and shot out of the pistol aforesaid by the said Needham Branch, in and upon the breast of the said Bill Stewart, one mortal wound of the depth of six inches, and of the width of one-half inch, of which said mortal wound the said Bill Stewart then and there instantly died. So the grand jury aforesaid, upon their oath aforesaid, do say that the said Needham Branch the said Bill Stewart, in manner and by the means aforesaid, feloniously, wilfully, and of his deliberately premeditated malice aforethought, did kill and murder; against the peace and dignity of the State."

The conviction was for murder in the second degree, and the punishment assessed was a term of five years in the penitentiary.

The opinion sets out substantially the testimony introduced by the State. In addition to that summary, the principal witness for the prosecution testified that before the deceased and Walker Sample overhauled or shouted at the party in the wagon, Alex. Monroe, one of that party, asked of the defendant: "Needham, have you got my pistol? Bill Stewart is drunk again, and by G—d, I am not going to take any more of his jaw." To this the defendant replied: "Yes, I have got it; and by G—d, I am not going to take any either." This witness stated further, that before the deceased reached the wagon, and as he approached it, the defendant pulled his pistol around his body in front, and that when the deceased first hallooed to the party, he said: "Hold on, Clabe; let's take a drink."

Walker Sample testified, for the defense, that when he and the deceased, riding horseback, came in sight of the wagon containing the defendant and the others of the party, the deceased, who was drunk, said: "Let's catch up with them fellows." He then proposed: "Let's shoot into them," and made

an effort to shoot, but the witness caught his gun and prevented him. The deceased then called to the party to stop the wagon, and said "if you don't, I will shoot into it and kill all of you." He, the deceased, wanted the party in the wagon to stop and take a drink. The deceased rode up to the right side of the wagon when it stopped, and made an effort to shoot but was prevented by the witness, who rode up between him and the wagon and caught the gun. The deceased then made an effort to strike John Sample with the gun, but the witness took the gun from him in time to prevent him doing so. The defendant about this time said: "Hold on, there. If you want to fight, fight a man, and don't fight a cripple." The deceased retorted: "If you want to fight, get out of that wagon." The defendant began to get out of the wagon on the right side, and the deceased to get off his horse, when the witness moved forward some seven or eight steps and discharged the gun. Almost instantly he heard the discharge of the pistol, but did not see it. The witness and the deceased went together from Center to the place of the killing. They stopped at Harris's to get the deceased's gun, where it had been left for repairs. Witness put one shell in it, and could not extract it. The deceased took four drinks between Center and Shelbyville. It was dark, but star-light, when the witness and deceased overhauled the wagon. The gun was cocked when the witness got it from the deceased. The killing occurred about one mile from Shelbyville.

John Sample, for the defense, corroborated the last witness as to what passed between the various parties from the time that the deceased first called to the party in the wagon. He stated, further, that the deceased having said, in answer to the defendant, "If you want to fight, get out of that wagon," the defendant got out on the right hand side, and went to the rear of the wagon. Walker Sample rode forward and discharged the gun, whereat the horses attached to the wagon sprang forward and threw the witness from the seat to the bottom of the wagon. Just then he heard the defendant exclaim: "Hold up, Bill; hold up!" and instantly heard the report of the pistol. When the deceased presented his gun at the person of the witness, in the first instance, it was cocked.

The witness denied that, on the night of the killing, he told Doctor A. S. Alford that Bill Stewart had been killed for nothing. He denied that he had ever told J. K. Wollem that it was the most uncalled for murder he ever saw in his life. The witness

was well acquainted with the reputation of the deceased for peace and violence. He was reputed to be a quiet, peaceable man when sober, but violent when under the influence of drink. It was dark at the time of the shooting—so dark that at a distance of ten or fifteen steps one could not see a man well enough to distinguish what he was doing. The witness and the defendant were cousins, and had been raised together from boyhood.

Alex. Monroe testified, for the defense, that he was one of the party in the wagon. The deceased came up behind the wagon and said: "By G—d, you stop that wagon or I will shoot every one of you." He cocked the gun and presented it, when Walker Sample caught it by the muzzle. The wagon stopped. The deceased rode up to the right side of the wagon, Walker Sample still having hold of the gun. The deceased was cursing, and saying that he was the best man on earth. He asked who was in the wagon, and John Sample answered: "Your best friends, Bill; Bud Lout, John Sample and Needham Branch." Deceased said: "If any of you have anything against J. P. Stewart, belch it," and added: "I can whip anything in that wagon." Walker Sample said: "Drive on, boys." The wagon went on twenty or thirty steps, when the deceased cried: "Clabe (meaning Lout), if you don't stop that wagon, I will kill every one of you," and put his gun to his face. He ran his horse up to the right front wheel, and presented his gun at John Sample, and said: "If you don't stop, I will kill every one of you." Walker Sample then took the gun away from him. The defendant then jumped up in the wagon and said: "If you want to fight, fight a man." Deceased answered: "If you want to fight, get out of that wagon." Defendant got out of the wagon on the right side, and walked back several steps behind the wagon. The deceased got off his horse, and started round his horse towards defendant. Walker Sample fired off the gun, when the horses attached to the wagon sprang forward, and the witness fell over and saw nothing more. The pistol fired just after the gun was fired. The deceased did not speak to the defendant when he rode up to the wagon.

The witness denied that, *en route*, he asked the defendant if he had his, witness's, pistol. Defendant said that he had it. The witness did say that the deceased was drunk, and that he, witness, would not take any of his jaw. The defendant said nothing about the deceased at that time. The deceased was reputed to be a violent man when drunk. The witness had heard Joe Boles and

John Lout say that the deceased was a bad man. In this last statement the witness was not sustained by Boles and Lout in rebuttal.

The sheriff of Shelby county testified, for the defense, that the deceased was generally credited as a violent man when drunk or drinking.

A. S. Alford testified, for the State, that John Sample told him, on the night of the killing, that the deceased had been killed for nothing. J. K. Wollem, in rebuttal, testified that at the inquest he remarked: "Boys, this is a bad thing," and that John Sample replied: "Yes, it was the most uncalled for thing I ever saw."

The motion for new trial raised, among others, the questions involved in the opinion.

*Drury Field,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Willson, Judge. There was no error in overruling defendant's motion in arrest of judgment, the indictment being, in all essentials, sufficient.

Defendant Branch shot and killed Bill Stewart, shooting once with a pistol. It was dark, or about dark, when the homicide occurred. John Sample, Alex. Monroe, Pad Lout, Clabe Lout, and the defendant, were in a wagon together, traveling from the town of Center, in Shelby county, to their homes. Deceased and Walker Sample, who were traveling on horseback, rode up behind the wagon. Deceased was armed with a double barrel shot gun, and was drunk. Deceased called out to Clabe Lout, who was driving the team to the wagon, to stop. Walker Sample, who was with deceased, told Clabe Lout to drive on—that deceased was drunk, and he could do nothing with him. Deceased then said: "Hold on, Clabe, or I will shoot into the wagon and kill the last one of you," and attempted to shoot but was prevented by Walker Sample. The wagon stopped, and deceased rode up to it and said, talking to John Sample· "I have been run over in this county ever since I have been in it, and if there is any one in the wagon that has got anything against J. P. Stewart, belch it." When deceased said this he attempted to shoot John Sample with the gun, and also to strike him with it, and was prevented by Walker Sample, who got the gun

away from him, and, going off a few steps, discharged the gun. When Walker Sample took the gun from deceased, defendant said to deceased: "I am some horse myself. If you want to fight, fight a man, and not a cripple." John Sample was a cripple. Defendant then got out of the wagon and walked to the rear end of it, and deceased dismounted from his horse and advanced towards the defendant, and when he had reached within a few feet of him defendant shot and killed him. Defendant shot almost instantly after Walker Sample had discharged deceased's gun. Defendant and John Sample were cousins, and had been raised up together from boyhood. When deceased presented the gun at John Sample, and when Walker Sample got it away from him, it was cocked. It was proved that when drunk the deceased was a man of violent and dangerous disposition.

Defendant proposed to prove, further, that the general reputation of the deceased was that he habitually carried a pistol. This proposed testimony was objected to by the State, and the objection was sustained because "it was not shown by the evidence that deceased had any arms on his person, nor that he made any gesture as if to draw a weapon, or did any act which the habit of carrying pistols would serve to explain." In rejecting this evidence the learned judge doubtless based his ruling upon the doctrine announced in Horbach's case, 43 Texas, 242, in which case the evidence showed that, at the time Horbach fired the fatal shot, the deceased was making a movement with his hand as if to draw a pistol. It was there held that evidence of the general character of deceased that he was a violent and dangerous man and in the habit of carrying a pistol was admissible, to explain the movement of his hand.

In the case before us the evidence shows no act on the part of the deceased indicating that he was armed with a pistol, and was attempting to use it. But it is shown that at the time he was shot he was angry at the defendant, and was advancing upon him in a threatening manner, and that it was dark or nearly so, and that he had dismounted from his horse for the purpose of engaging in a fight with defendant. Would the fact that the deceased was in the habit of carrying a pistol serve in any degree to explain favorably to the defendant the conduct of the deceased? If such was generally known to be his habit, the presumption is that the defendant was aware of it, and, being aware of it, would it be likely to influence him in repelling

the attack which was then being made upon him by the deceased ? It is reasonable to conclude that it would, although the deceased may have made no demonstration indicating a purpose to draw a pistol. We do not think that the rule laid down in the Horbach case is to be restricted to the one act of seemingly attempting to draw a pistol or other weapon. It seems to us that the reason of that rule applies with equal force to any act reasonably indicating a present purpose on the part of the person slain to kill or do serious bodily injury to the slayer. In the case before us, we think the proposed evidence should have been admitted.

There is no bill of exceptions in the record presenting the question as to the correctness of the ruling of the court in admitting in evidence declarations of John Sample, made after the homicide had occurred. That question, therefore, is not before us in such manner as we can determine it. We will remark, however, that such declarations would be admissible for one purpose only, if at all, and that purpose would be to impeach the witness John Sample, and, if admitted for this purpose, the jury should be instructed by the court that they were not at liberty to consider such evidence for any other purpose.

Several objections are urged by defendant's counsel to the charge of the court, and it is also contended that the court erred in refusing special charges requested by defendant. Without discussing in detail each of the assignments of error relating to the charge of the court, and the refusal of charges asked, we will notice such only as in our opinion are well taken.

One paragraph of the charge given to the jury is as follows: "When, therefore, an unlawful act is clearly shown to have been done, and it does not appear from the testimony offered by the State that it was done under circumstances which mitigate, excuse or justify it, it is for the defendant to show facts which excuse or justify it, so that a reasonable doubt at least may arise on the evidence as to his guilt."

Similar charges to this have several times been before this court in similar cases, and we consider it now well settled by the decisions of this court that they are objectionable, and constitute in most instances material error. (*Ake* v. *The State*, 6 Texas, Ct. App., 398; *Dubose* v. *The State*, 10 Texas Ct. App., 230; *Jones* v. *The State*, 13 Texas Ct. App., 1.) In the case before us, we think it was error to give the charge above quoted,

and, this charge having been excepted to at the time it was given to the jury, it is not necessary to inquire further as to whether or not it was calculated to injure the rights of the defendant.

Defendant requested the following charge to be given to the jury, which was refused, viz: "If it reasonably appeared by the acts or by words coupled with the acts of the deceased, that it was the purpose and intent of the deceased to take the life of the defendant, or do him some serious bodily harm, the defendant was not bound to resort to all other means to prevent the injury, except to retreat, but on the contrary defendant had the right to slay him instantly without such resort."

In the charge given to the jury, they were instructed that the defendant must have resorted to all other means, save that of retreat, and that, unless he did so, he could not avail himself of the plea of self-defense. The charge of the court, as given to the jury, and the charge asked by the defendant and refused, are in direct conflict with each other upon the question as to whether or not, when a person is assaulted under such circumstances as make it reasonably appear to him that the purpose of the assailant is to kill or do him seriously bodily injury, he must resort to all other means save retreat to avoid the threatened injury, before he will be justified in slaying the assailant.

It is unnecessary that we should enter upon a discussion of the question thus presented. It has heretofore, several times, been fully considered and plainly determined, and it may be regarded as now settled law that, when a person is attacked under such circumstances as reasonably indicate a purpose and intent on the part of the attacking party to murder or maim him, or to do him serious injury, the person so attacked, or any person who interferes for him, is not compelled to resort to other means for the prevention of the injury, but may slay upon the spot, being responsible for any mistake if the right of resistance or interference is exercised under circumstances not sustained by law. (*Kendall* v. *The State*, 8 Texas Ct. App., 569; *Ainsworth* v. *The State*, Id., 532; *Foster* v. *The State*, 11 Texas Ct. App., 105.) We think the court erred in its charge, and erred in refusing the special charge requested by the defendant.

In one other respect we think the charge of the learned judge is deficient. It very properly instructed the jury that, if the defendant provoked the attack of the deceased, or entered willingly into a fight with the deceased, he could not avail himself

of perfect self-defense. In this connection, under the evidence in this case, we think the court should have further instructed the jury that, if they believed from the evidence that the deceased was making or about to make an attack upon John Sample, with the purpose and intent to kill Sample, or to do him serious injury, or that if, from the conduct of deceased, it so reasonably appeared to defendant that such attack was being, or was then about to be made, he, the defendant, would have the same right to prevent the injury threatened that Sample would have to prevent it. If it was the purpose of defendant in interfering in the difficulty, then pending between the deceased and John Sample, to prevent deceased from killing, or seriously injuring, Sample, then such interference on his part should not be regarded as provoking the attack of deceased, or as a willing entry into a fight with him. A special charge, calling the attention of the court to this phase of the case, was requested by defendant and refused by the court. We think the evidence demanded a charge from the court elucidating this particular feature of the issue of self-defense.

Because of the several errors we have noticed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 21, 1883.