*Reversed and remanded.*

Opinion delivered February 2, 1884.

[No. 1570.]

ED. SHORT *v.* THE STATE.

1. MURDER—CHARGE OF THE COURT—PRACTICE.—See the statement of the case for charges of the trial court on implied malice and murder in the second degree, which, though not explicit as they should be, are held sufficient, in view of the fact that no exceptions were reserved, and no special charges asked on the subjects.

2. SELF-DEFENSE—CHARGE OF THE COURT.—See the opinion for a charge of the court upon the subject of self-defense, *held* insufficient, because it limited the right of self-defense to reasonable apprehension on the part of defendant that deceased was in the act of murdering or maiming him. Note the true doctrine on the subject, which, under the evidence in this case, should have been given in charge.

APPEAL from the District Court of Grayson. Tried below before the Hon. R. Maltbie.

The indictment charged the appellant with the murder of Dick Watson, by striking him with an ax. The offense was alleged to have been committed on the seventh day of November, 1875, and the venue was laid in Grayson county. The conviction was for murder in the second degree, and the punishment awarded was a term of twenty years in the penitentiary.

The charge upon implied malice, referred to in the first head note, reads as follows:

"Malice is implied where a homicide is shown, and where it is not shown that the killing was done with a cool and deliberate mind and formed design on the one hand, and where the evidence, on the other hand, does not show the killing to have been done under circumstances that would reduce it to negligent homicide, or manslaughter, or which justify or excuse the killing altogether."

The charge upon murder in the second degree, referred to in the same head note, reads as follows :

"If you believe from the evidence that the defendant, Ed. Short, at the place and within the time above stated, made an assault and battery with an ax upon Dick Watson, and that said ax, in the mode and manner of its use, was a deadly weapon, upon implied malice as hereinbefore defined, that is, if you believe the defendant committed a battery as above stated, and you also believe that at the time the defendant did not have in his mind a formed design to take the life of the said Dick Watson, or that his mind was so agitated by passion, or some other emotion of the mind, that he could or did not contemplate the consequences of his acts, and you further believe that the said Dick Watson instantly died from the effects of said blows with the ax, you will find the defendant guilty of murder of the second degree as charged in the indictment; and in that event the form of your verdict will be: 'We, the jury, find the defendant, Ed. Short, guilty of murder in the second degree,' and assess his punishment at confinement in the penitentiary for any period of time not less than five years."

The testimony of Belle Parish, the first witness for the State, is set forth in substance in the opinion of this court.

J. M. Wilson testified, for the State, that he knew the deceased for about one year before his death. On the morning of November 7, 1875, he heard screaming in the direction of the house of Mrs. Roberts, the mother of the defendant, who lives about a half mile distant from the house of the witness. Witness looked and saw two little girls running toward him. When he learned what had happened the witness sent Doctor Groves to Mrs. Roberts's house, sent the deputy sheriff in pursuit of the defendant, summoned a jury of inquest (he was then a justice of the peace), and went to Mrs. Roberts's house. Doctors Groves and Trolinger had already reached the house when the witness arrived.

The deceased was lying on the floor of the south room, nearly on his face, inclining a little to the right side. The body was bloody, evidently from the cuts of an ax. As well as witness could now remember, there were three or four cuts on the body —one on the right and one on the left side of the forehead; another near the centre of the top of the head, a little back of the spine, which was severed. There was also a cut on one of the arms. Witness was of impression, but was not certain, that

there were cuts on the floor. He could not say that they were made by the same strokes which cut the deceased. He could not remember that there was or was not blood and brains scattered over the ceiling above the body. Mrs. Roberts, the defendant's mother, and Lizzie Roberts, his half sister, testified before the coroner's inquest. Belle Parish did not. Witness lived in Whitesboro ever after this occurrence. Since that time until September, 1883, he saw nothing of the defendant. Witness was employed as counsel for the defense in this case about two weeks before this trial.

Doctor Henry Trolinger testified, for the State, that he was present at the inquest upon the body of deceased on the seventh day of November, 1875, and examined the body. The witness did not think, judging from appearances, that the body had been moved from where it fell, at the time that he saw it. The body lay on the face and breast, slightly inclined toward the right side. The head lay toward the southeast corner of the room, and the feet, which were drawn up, rather toward the southwest corner. The calves of the legs were pressed against a chair, which was leaning against a bed that stood in the southwest corner of the room. The position of the deceased, with reference to the chair, was as though he had fallen over on the floor from a sitting posture in the chair. The general attitude of the body was southeast and northwest, and it lay near the centre of the room. A half-peeled turnip lay on the floor in front of the body, two or three feet distant. The deceased held a barlow knife in his right hand, the handle grasped so that the blade extended between the thumb and fore finger, and was half closed on the thumb, as though the deceased had fallen on it.

Blood and brains were scattered over the ceiling above the body, and spattered around and under the body where it lay. There were six wounds upon the body, all of which appeared to have been inflicted with an ax. They were all recent wounds, and five of them were necessarily fatal. The head was nearly split in two by a blow in the rear of the middle of the head. The spine was severed diagonally near the middle of the back. A gash nearly parallel with the spinal column almost severed the left shoulder from the body. The right arm was almost cut in two. A piece of skull was cut from each side of the head by glancing blows, which made gashes in the floor at the same time. None of the wounds were in front of the hair. The

wound severing the spine, and that on the rear of the centre of the head, would each have produced instant death. The wounds on the person of the deceased could none of them have been inflicted by a person standing in front of the deceased, unless the deceased had been in a low stooping posture. All the wounds had the appearance of having been inflicted from behind. Witness was present at the inquest, but never heard of the deceased advancing on the defendant with a knife until since the return of the defendant. A great excitement pervaded the country after the killing, and the country was scoured for the defendant, but the witness heard nothing of him until his return, in September, 1883.

Doctor W. W. Groves, for the State, with respect to the wounds, position of the body, the chair, bed, peeled turnip, and other surroundings, testified exactly as did Doctor Trolinger. On cross-examination, he stated that the wounds on the deceased might have been inflicted from in front of deceased, if the deceased was in a stooping posture and the person inflicting them stood directly over him. The wound which severed the spine was diagonal from left to right, between the shoulder blades, higher on the left than on the right. Either this or the wound which split the head open would have produced instant death. The knife held by the deceased in his right hand was a double bladed barlow knife, about three inches long, and had been whetted very sharp, as also had been the ax. So sharp was the ax that the hair, where the wounds were made on the head, was cut as if done with a razor. The deceased was about thirty years of age at the time of his death, and the defendant about nineteen or twenty. He had no beard, was rather stooped in the shoulders, and looked like a consumptive. The deceased was a stouter man than the defendant, and would have weighed probably one hundred and sixty pounds.

Sheriff Douglass' testified, for the State, that he arrested the defendant at his mother's house, at night, in September, 1883. There was considerable delay in opening the door. Mrs. Roberts, in answer to a question, said something about the delay— possibly that she was hunting matches. Defendant said that he was looking for witnesses, or expecting arrest. He made no resistance. The state closed on this evidence.

Finis Moon testified, for the defense, that he lived on the farm adjoining that on which deceased was killed. Some two or three days before the killing witness had a conversation with

the deceased, during the course of which deceased said that he would "burst defendant's head open and risk it."

Cross-examined, the witness stated that at the time of the killing he had been in the neighborhood but a short time, and had had but two or three conversations with deceased. He had never told of this conversation until on this trial. No one had ever asked him what his testimony on this trial would be.

In rebuttal, several witnesses testified that the general reputation of the deceased was that of a quiet, peaceable man. Doctor Groves stated that he regarded the deceased as weak minded and half witted, of little general account, but an honest, hard working man.

The motion for new trial challenged the correctness of the charge of the court in various particulars, and denounced the verdict as unsupported by evidence.

No brief for appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant having been convicted of murder in the second degree, several nice questions raised with regard to murder of the first degree as submitted in the charge of the court to the jury, and as omitted in said charge, are rendered inconsequential in that they can no longer affect appellant's rights. We will therefore address ourselves to the case of murder in the second degree as presented in the record. In order to illustrate our impressions as to the main points in the case, we will state in brief the circumstances surrounding the parties at the time of the homicide and attendant upon it.

Watson, the deceased, had been living for some time in the family of the mother of appellant. From some cause not developed, these two parties were not getting along well together. Belle Parish, the first witness for the State, a half-sister of appellant, and who was present when the difficulty occurred, states in substance that, whilst defendant was out getting a horse preparatory to going on a mission for his mother, deceased came into the room where she, her mother and sister were, and, sitting down in front of the fire, whetted his knife and ax. Her mother took the ax, and, after cracking some hickory nuts with it near the door, sat it down close to the casing of the door. About this time defendant came in and inquired of his mother

what the message was she wished him to carry to his uncle. She delivered the message, when defendant said: "Mother, there is one thing I want to say to you, and you can make up your mind about it while I am gone; and that is, that Dick Watson (deceased) or I one will have to leave here." Watson, the deceased, then said that he was not going to leave, and that it had as well be settled now as any time; and got up out of his chair with his knife in his hand, opened, and made a lunge at defendant with his knife grasped in his right hand, advancing in a stooped position. The chair which Watson was sitting in fell back as he raised up. The defendant then stepped one step to the right with his right foot, and reached with his right hand for the ax, which was on the porch leaning against the house and near the door defendant was standing in. Defendant then raised the ax; defendant and deceased were close together. And she does not remember any more till she was out in the yard. None of the other parties who were present at the time of the homicide testified at the trial, nor is any explanation made with regard to their absence. Deceased was evidently killed by blows from the ax, one or more of which, according to the testimony of the medical experts, inflicted wounds necessarily and instantly fatal.

In the absence of special exception to the charge on implied malice and murder in the second degree, whilst it is true that the definition or explanation of the term *malice* might be more full and explicit, still it cannot be said to be radically and fundamentally wrong, and no special instructions were asked with a purpose to cure its supposed defects.

Upon the subject of self-defense, the only instruction found in the charge is as follows, in paragraph eight: "8. If you believe from the evidence that it reasonably appeared to defendant by the acts or by the words coupled with the acts of the said Dick Watson, that the said Watson was in the act of murdering or maiming the defendant: or after the said Watson had done some act showing evidently an intent to murder or maim the defendant, and that the defendant then and there assaulted the deceased with an ax, from the effects of which he died, you will find the defendant not guilty; and in determining this matter you will view the evidence from the standpoint of the defendant."

It will readily be seen that this charge limits the right of self-defense to reasonable apprehension on the part of defendant

that deceased was in the act of murdering or maiming him. Now, whilst a homicide is clearly permitted by law under such circumstances as those named in the charge (Penal Code, Art. 570), the facts in this case, as above set out, it seems to us, required further instructions upon self-defense than those relating to a defense against murder or maiming. After the killing, it was found that the knife, which deceased still held grasped in his hand, was a pocket barlow knife. We will suppose, for the sake of argument, that defendant and the jury which tried him neither could have believed, from the character of the knife, that it reasonably appeared that deceased intended to murder or to maim him when he made the lunge at him with the knife spoken of by the witness. Would he therefore be deprived of his right to take the life of his assailant? Certainly not, if he could show that the attack was unlawful and violent, and one from which he was likely to suffer serious injury to his person, one which was so sudden, immediate and pressing that he would have no time to resort to other means for the prevention of the injury, except by retreating, which no man is bound to do. (Penal Code, Arts., 572, 573, 574; *Horbach* v. *The State*, 43 Texas, 242; *Ainsworth* v. *The State*, 8 Texas Ct. App., 532; *Boddy* v. *The State*, 14 Texas Ct. App., 528; *Barrett* v. *The State*, 9 Texas Ct. App., 33.)

The questions which should have been submitted to the jury on the evidence, in addition to the one submitted by the charge, were: Did deceased make a violent and unlawful attack upon defendant, producing a reasonable expectation or fear of death or serious bodily injury? Was he in the very act of making such an unlawful attack? Could defendant have reasonably resorted to any other means, save flight, taking into consideration the circumstances, than those he availed of? If not, then the killing was justifiable, and the jury should acquit.

Because the charge did not sufficiently present the law of self-defense applicable to the facts, the judgment is reversed and the cause remanded.

*Reversed and remanded.*