## A. K. TAYLOR *v.* THE STATE.

1. CONSTRUCTION OF STATUTES. — All laws *in pari materia* must be construed together as one law, if not inconsistent. Repeals by implication are not favored.

2. JURY — SPECIAL VENIRE. — The jury law of 1876 does not repeal all previous laws on the subject of selecting and impaneling juries, but only such laws and parts of laws as conflict with its provisions. It does not repeal or supersede article 556 of the Code of Criminal Procedure (Pasc. Dig., art. 3024), which directs that, in forming a jury from a special *venire* summoned for the trial of a capital case, "the names of the persons summoned shall be called in the order they stand upon the list, and, if present, shall be tried as to their qualifications, and, unless challenged, shall be impaneled." They are to be called, tested, and passed upon, consecutively, one at a time.

3. SAME. — Section 22 of the Jury Act of 1876 has reference to the formation of juries from the regular *venire* for the term, and not to special *venires.* Section 23 of the act prescribes the mode of obtaining the names of persons to be summoned on a special *venire,* but not the mode of impaneling the

jury from the *venire* summoned; and, therefore, is not in conflict with article 3024, Paschal's Digest, above quoted.

4. EVIDENCE. — Though a defendant be indicted separately, instead of jointly with his confederates in the crime, their acts, done in furtherance of the common design, are evidence against him — the true question being, not who are indicted for the offense, but who participated in its commission.

5. MURDER OF THE FIRST DEGREE — PENALTY. — As the Penal Code (Pasc. Dig., art. 1639) prohibits the infliction of death for any offense committed before the perpetrator had arrived at the age of seventeen, the court below instructed the jury that, if they found the accused guilty of murder of the first degree, and that he was under seventeen when it was committed, they would assess his punishment at imprisonment for life. The jury returned a verdict convicting him of murder in the first degree, and assessing his punishment at imprisonment for life, but without otherwise finding that he was under seventeen when the murder was committed. *Held*, correct practice — the judgment being affirmed.

APPEAL from the District Court of Montague. Tried below before the Hon. J. A. CARROLL.

The annals of criminal jurisprudence have seldom chronicled a more horrible atrocity than that revealed by the record of this case.

William England resided on Denton's Creek, in Montague County, with his family, which comprised his wife, Selina, and her three children by a former marriage — Isaiah, Harvey, and Susie Taylor. During the night of Saturday, August 26, 1876, they were beset in their own house by assassins, and all, except Harvey Taylor, either instantly killed or mortally wounded.

On October 31, 1876, Ben Krebs and James Preston were jointly indicted for the murder of William England, and A. K. Taylor, the present appellant, was separately indicted for the murder of Mrs. Selina England. With the former case we are at present but incidentally concerned, but may say that Krebs was separately tried in November, 1876, was found guilty by the jury, and the penalty of death adjudged against him; from which judgment he appealed to this court. His appeal had precedence of the

present one ; but, his first transcript being defective, a second was ordered, and consequently the appeal of Taylor first reached a final disposition. That of Krebs will be found reported in the present volume, *post.*

The case of A. K. Taylor, the present appellant, came to trial in the District Court at its June term, 1877.

Harvey Taylor, the only survivor of the England household, testified for the state, and gave the earliest account of the events of that fearful night. He stated that the family had set up somewhat late, talking about home affairs and Isaiah Taylor's approaching marriage. After prayers, the family prepared to go to bed. Witness took his bed out on the porch, where it would be cooler to sleep than in the house, and, as he lay down, he noticed three men coming down the road from the direction of the town of Montague. At first he took them to be three brothers of his, who had gone to live on their preëmptions. Witness observed that the smallest of the three men came in at the front gate, which was about ten feet from the porch. The other two were large men, about the size of Ben Krebs and James Preston, and were crouching down as though trying to conceal themselves.

The smallest man came on the porch to where witness was lying, and, pointing a pistol at him, said " G—d d—n you, get in the house." The moon was shining, and the man was in two or three feet of witness, who thought he resembled Bill Taylor, a brother of A. K. Taylor, the defendant, and so much like him that they might be taken for twins. When ordered to get into the house, witness passed into the north room, and saw his brother Isaiah in the doorway between it and the south room. The man came in and presented his pistol at Isaiah, saying, " G—d d—n you, I told you I would kill you, and now I intend to do it." He fired, and witness saw Isaiah fall. Witness

ran out of the back door and heard another shot in the house, and then heard several shots, and men cursing and women screaming. After the screaming he heard more shots, and then heard no more noise of any kind.

Witness ran off through the field to the residence of Mr. Williard, distant about a quarter of a mile, and told Mr. Williard what had happened; and about two o'clock Mr. Williard and his wife and witness went over to England's. The others stopping at the front gate, witness went into the house and lighted a candle, and there found his step-father, William England, lying on his face, and dead, having been shot through the body and his throat cut; and found his sister Susie lying on the walk in front of the porch, having been shot dead. His brother Isaiah was not seen until after daylight, when he was found dead, about fifty yards from the house, on the road that leads from Krebs' house.

E. T. Van Hooser, for the state, testified that he knew Mrs. Selina England, who was shot on the night of August 26, 1876, and died the next night. Mr. Music came after witness, the night of the murders, and told witness that Mrs. England was at his house, shot. Witness went over to Music's, and there found Mrs. England, very badly shot on the left side of the back. She was in her right mind, and said she was bound to die. Witness asked her if she knew who shot her. She said, "Mr. Van Hooser, do I know you?" Witness told her he supposed she did. Then she said, "I know that old Ben Krebs has killed me and my whole family." She said nothing to witness about who did the killing, until he asked her. She said she knew the man well, and told witness to go to Krebs' house and arrest him and all others there.

On going to William England's house, witness found him lying about half-way out of the west door of the north room; his head and part of his body being on the porch,

and his feet and legs in the house.  He was shot through the breast, and his throat was cut with a knife or some sharp instrument.

Susie Taylor was shot in the body, and lying dead on the walk between the porch and the gate.  There was blood on the floor of the north room, near the east wall, and two streams of blood from there to where the old man lay in the door; and on each side of the door-facing were the prints of bloody fingers, scraping down each side of the door, as if the old man had tried to hold himself up while sinking down.  There was a large pool of blood where he lay, and several pools in the house.

When daylight came, witness saw the body of Isaiah Taylor lying in the road, and about forty yards south of the house.  He was shot through the body, and was dead.  Ben Krebs lives about half a mile south of England's, and in sight.

Dr. J. E. Stinson, for the state, testified that about eleven or twelve o'clock on the night of August 26, 1876, a messenger came for him to go and see the England family, who, the messenger said, were all murdered, except Mrs. England, and she was at John Music's, badly wounded. Hastening to Music's, witness there found Mrs. Selina England.  She was shot in the back, and the ball had passed out at her breast.  She was mortally wounded, and perfectly conscious that she would die.  Witness talked with her and found her perfectly rational.  She commenced to tell witness who had done the killing, when witness said to her, " Mrs. England, you ought to be careful what you state about this matter; for anything you say, under the circumstances, will be taken as evidence, and you might hang an innocent person."

She then proceeded to say:  " I know that I must soon die, and I want to tell you all about it.  Old Ben Krebs has killed me and my family.  Last night we sat up late,

talking about the approaching marriage of our son Isaiah
Taylor.   We had just finished prayers.   My son Harvey
had gone out on the porch to lie down.   Soon afterwards
he came rushing into the room, and a man behind him.
The man shot my son Isaiah Taylor, and, as me and my
daughter Susie ran out of the room, barefooted, old Ben
Krebs followed us out.   We scrambled over the yard fence
and ran down towards the cow-lot gate, old Ben Krebs
following us, shooting at us, and cursing us all the time.
We were screaming, and Susie said, ' Mother, old Ben
Krebs is come to kill us all.'   Krebs said, ' G—d d—n you,
you need not scream ; I have come to kill you, and, G—d
d—n you, I am going to do it.'   When we ran towards the
cow-lot gate, he headed us and got between us and the
gate.   We then turned and ran back towards the gate in
front of the porch, on the west side of the house.   Susie
and I were together ; she was clinging to me.   Ben Krebs
was shooting at us and cursing all the time.   When he shot
me I fell against the fence, and I did not see Susie any
more, but in a moment I heard Susie cry out, ' Oh, mother,
Krebs has killed me.'   I lay there for a few moments, and,
after recovering a little, I heard my husband, William
England, calling me.   I rushed into the house with Krebs
after me, and there I saw my husband sitting in a chair next
to the east wall, with either James Preston or a Dutchman
who had stayed at our house the day before pulling his
head back by the hair and cutting his throat with a knife.
I ran close enough by him to brush his knees with my
dress.   Krebs was still after me, and I ran out of the back
door into the yard, and from there into the garden, where I
fainted.   After resting a little bit, I got up, and pulled up
one of the garden pickets and went into the cotton-field.
I fainted several times before I got to Mr. Music's.   When
I got there I told Mr. Music who had killed me.   He took
me in the house and sent for the doctor.''

The witness Stinson, after thus relating the declarations of Mrs. England, stated that before day he and others went over to William England's house. His description of the scene of slaughter was the same, in substance, as that previously given by Harvey Taylor and Van Hooser. Cross-examination elicited nothing further, except that Mrs. England also said that when Krebs shot her she was close enough to him to have put her hands in his whiskers, and that on the next morning witness saw Krebs and Preston when they were arrested, and Krebs had on a clean shirt.

A. L. Matlock, for the state, testified that on Sunday morning, August 27, 1876, he was informed that the England family had been murdered by somebody; and, being county attorney, witness mounted his horse and hurried to the scene. Witness reached there about nine o'clock, and found quite a number of persons already there. Entering the house, he found Mrs. Selina England in one of the back rooms, mortally wounded. Witness knelt down by her and whispered to her, and asked her to tell him who it was that had murdered her family. She was perfectly rational; knew witness, and all about what was passing, and told witness she knew she was going to die. She said that Ben Krebs and either James Preston or a Dutchman who had been at her house the evening before were two of the parties who had done the deed. Witness then went out and arrested Krebs, who was standing in the crowd, and also Preston, who was near by. Witness and the sheriff of the county then arrested the Dutchman who had been at Mrs. England's the night before, and took him before Mrs. England, who immediately said he was not the man, and he was released.

Mrs. England then proceeded voluntarily to narrate to this witness the events of the night before. His relation of her statements is substantially, and in many respects literally, the same as that which, according to the previous

witness, Stinson, she gave to the latter during the preceding night, and, therefore, need not be here repeated.

This witness also gave substantially the same account as Harvey Taylor and Van Hooser of the position of the dead, and the indications of the savage incidents of the night previous.

Proceeding with his testimony, Mr. Matlock said that he had the sheriff take Krebs into the presence of Mrs. England for the purpose of identification, and witness asked her if this was the man that shot her ; and she said, " Yes." Krebs said, " You must be mistaken ; it must be your imagination." He said this three or four times. She then said to him, " Mr. Krebs, don't you feel mighty bad about killing my poor children and my poor husband?" He again denied it, and said it was her imagination. She said, " I am not mistaken ; I was close enough to you to put my hand in your whiskers, if I had wanted to. I knew you by your whiskers ; I knew your face ; I knew your Dutch talk ; I knew your curses ; and I even recognized that old white hat you now hold in your hand." Krebs was then removed from her presence, though he seemed disposed to talk more.

Mr. Matlock proceeded to search for tracks, and was shown one at the north end of the house, and said to be that of one of the murderers. On measuring it he concluded it was made by a number eight or nine shoe. He then, with five other persons whom he named, went to where Mrs. England had said she and her daughter had scrambled over the yard fence. There the witness and his companions found two small barefooted tracks, apparently those of women running, and going in the direction of the cow-lot gate. These were followed by a larger shoe-track, which appeared as though made by a man. This track followed directly after the barefooted tracks until just before

the latter reached the cow-lot gate, where it passed round and seemed to head off the barefoot tracks. All three of the tracks then turned back towards the house, and crossed over into the yard, where, owing to the tramping of others, they could not be trailed. The man's shoe-track was that of about a number eight or nine brogan shoe, with the left heel slightly run down; it was carefully measured, and was found to correspond with the track first found at the north end of the house. Going into the cow-lot, witness and his companions found a track which they thought was the same brogan shoe-track — the measurement being the same, and the track of the left shoe showing the same run-down appearance. Getting over the fence between the cow-lot and the cotton-field, they found in the latter the tracks of three men. One of these corresponded with the brogan shoe-track already described; another appeared to be also that of brogan shoes of about the same number, with broad heels; while the third was a small track, with small heels, about number five or six, and appeared, as witness then thought, to be a boot-track. These three tracks proceeded, nearly parallel with each other, towards the house of Ben Krebs.

Mr. Matlock and another of the trailing party followed the run-down shoe-track until it crossed England's cotton-field fence into the public road, and found it again on the other side of the road, where it took a dim path which led the trailers to Krebs' fence, which they crossed into his corn-field, in which they followed the same track to a point within 150 yards of Krebs' house, where it was joined by the two other tracks, which others of the trailing party had followed. The tracks were measured at this point by the witness, and were found to correspond exactly with the three tracks found in England's cotton-field. They were followed on to within about fifty yards of Krebs' house, where, on account of high grass and weeds, they could not

be discovered. The distance from Krebs' house to where the tracks were first found was called half a mile.

Mr. Matlock preserved the measures he took of the tracks, and, on returning to the town of Montague, went to the jail and measured the shoes of Krebs, James Preston, and A. K. Taylor, the appellant. He found that their shoes exactly corresponded with the measures. Krebs' shoes were number eight or nine; the left one was slightly run down, while the right one was not. Preston's were brogans, number eight or nine. A. K. Taylor's were number five or six, with high heels, like boots. Afterwards Krebs and Preston were brought out of jail, and witness measured their tracks with the same measures, and concluded they were two of the three he had followed to Krebs' house. All the tracks followed through England's and Krebs' fields were freshly made, and not more than a day old. This witness exhibited to the jury, as part of his testimony, a diagram of the houses and inclosures of England and Krebs, and showing the route of the tracks described by him.

On his cross-examination Mr. Matlock stated that the shoes of the prisoners were not fitted into the tracks. They had been carried off to jail before the search for tracks was begun. The measurements were made with a stick. Mrs. England stated that the man she saw cutting Mr. England's throat was somewhat bald. An information for aggravated assault on William England was pending in the County Court against Ben Krebs, and England and his wife were the witnesses whose names were indorsed on the information. The cause was to have been tried on the first Monday of September, about nine days after the murder of the England family.

C. G. McGuire, for the state, testified that, on the morning after the murders, he was at England's house, and was sitting on the wood-pile as Krebs and James Preston came

from towards Krebs' house. As they came near Isaiah
Taylor's body, where it lay in the road, they bore to the
left of the road and went round the body about ten feet. They
came up to where witness was sitting, and he observed that
they were both very pale, and were trembling so much that
he could see their clothes shake on them. Preston's pants
were wet up to the pockets, and looked as if they had been
dipped in water. Witness was one of the party who exam-
ined and measured the tracks, and gave substantially the
same testimony concerning them as that previously given
by the witness Matlock.

Dr. J. E. Stinson, recalled by the state, testified that,
on Monday morning after the murder of the England fam-
ily during the previous Saturday night, he and three others
went to search Krebs' house. Being assured that nothing
should be injured, Mrs. Krebs made no objection to the
search. Witness asked for the shirt which Krebs had pulled
off when he last changed his clothes. Mrs. Krebs had
search made in the house and yard for some time, and at
last little Mary Savage, a daughter of Mrs. Krebs, got the
shirt down from the loft of the house, by climbing on the
bed and feeling up for it. It was tightly rolled up, and a
shirt shown to witness was recognized by him as the same.
He pointed out various stains upon it, and also a hole
where he had cut out one of the stains, and had analyzed
it and found it to be blood, though he could not say of
what kind. After the shirt was found, Mrs. Krebs said that
Krebs had changed shirts on Saturday morning before
going to town with her — she having told him he must put
on a clean shirt if he went with her. The family seemed
surprised when they saw the blood on the shirt. Arms
being inquired for, she said there were none of any kind in
the house except an old pistol that had neither handle nor
mainspring, and this she produced, rusty and disused.
After rigid search the party found two other pistols, one a

navy six-shooter, with five fresh loads in it, and freshly capped, the sixth barrel showing that it had been recently discharged; the other pistol was a small cartridge-pistol. When the six-shooter was found hid among some clothing in a little cupboard near the door, Mrs. Krebs expressed surprise, and said it was an old pistol some one had put there several months before, and that it had not been used for a long time. Upon further search, eight or nine moulded balls were found, of proper size to fit the pistol, and of the same size as two balls which witness had picked up in the room where old man England was killed. The pistol and all the balls mentioned were put in evidence.

Harvey Taylor, recalled by the state, testified that, about a month before the murder of the England family, William England, Mrs. England, and witness were down at Krebs' corn-field putting up the fence, so that it would keep England's live-stock out of Krebs' field. While there they heard hogs squealing and dogs barking, and went to get the hogs away. A difficulty then occurred between William England and Ben Krebs. England pointing out to Krebs some cracks in the fence, Krebs got angry and picked up a fence-stake six feet long, and approached England in an angry manner and threatening manner, with the stake raised in striking distance of England. Mrs. England interposed, and told Krebs to talk to her; at which he backed off and came again, several times, in a threatening manner, and said, " G—d d—n you, if you come down here any more, I will kill you." On cross-examination the witness said that Krebs then took him down the creek and talked with him a long time, and said, " If William England is a Christian and does this way, I have no use for Christianity— hell is broiling for such men as he is." When the threatening gesture at England was made by Krebs, the fence was between them. Isaiah Taylor was not present during the difficulty.

W. Y. Nix and Albert Hammond, for the state, testified that, two or three weeks before the murder of the England family, they, Ben Krebs and several others were at the blacksmith-shop in the town of Montague. Krebs seemed to be mad; he had a stick, and was showing how a difficulty between himself and William England had occurred. Krebs said England had indicted him, and, before he would be sent to the penitentiary, he would kill the England family.

Jonathan Stroud, for the state, testified that, in July, 1876, he was traveling the road near Krebs' place, and met Isaiah Taylor and Bridgewater, and, while talking with them, Krebs and his wife came up. Isaiah and Bridgewater went on a short distance, and witness had a little talk with Krebs about a thresher, when Krebs commenced talking about his difficulty with the England family, and, pointing his finger at Isaiah (Mr. England's step-son), said, "If ever I get a chance at that d—d rascal, I will clean him up." Krebs spoke about England's stock annoying him, and said he had been run over about as long as he intended to allow.

John Crier, for the state, testified that, a short time before the murders, he, James Preston, and others were on a buffalo hunt; that Preston spoke angrily about the England family, and said they had been witnesses against his son; but witness could not remember his words.

W. W. Richie, for the state, testified that, about sundown of August 26, 1876 (in the night of which day the murders were committed), he and his son were at Ben Krebs' house, and saw there together Ben Krebs, James Preston, and A. K. Taylor, the appellant. The latter had a shotgun, and a little boy with him a pistol; they started off, and said they were going hunting.

L. N. Perkins, for the state, testified that he was the sheriff of Montague County, and was with Matlock when the latter went to the jail to measure the shoes of Krebs,

Preston, and A. K. Taylor; and the witness corroborated Matlock's statement about Krebs' shoes.

With this evidence the state rested.

Mrs. Rhoda Krebs, for the defense, testified that she was the wife of Ben Krebs and the sister of A. K. Taylor, the appellant, and that she had known James Preston for about three years. Witness supposed that Mrs. Selina England was acquainted with James Preston, as he lived for about two years some two miles from her.

" On Saturday morning, before the killing," said the witness, " Ben Krebs and I were going to town. I asked him if he was going to town with that dirty shirt on, and I told him that, if he wanted to go to town with me, he must put on a clean shirt. I told him I would get the shirt for him. On Friday evening, before the killing, Ben Krebs cleaned two turkeys. He hung them up, tied by the necks, to the upper part of the stable-door. He then cut around their necks and skinned them down; then took out their entrails. The turkeys were hanging up about waist high; I do not know whether he got any blood on himself or not. On Monday morning, after the killing, Dr. Stinson and several other men came to my house and said they wanted to search the house for evidences of guilt. I do not know whether they asked for arms or not. There were two pistols, but I did not know it; I had forgot about the pistol being on the shelf. I had told Johnnie Savage ( a son of witness and step-son of Krebs) to put the pistol where it would not shoot any one; I did not see him put the pistol up.

" When Ben Krebs and I got back home from town, on Saturday, before the killing, James Preston was at our house. He was just going to start home. He lived on Sandy, about eighteen miles distant. This was about one hour by sun. I got supper, and we all eat, and sat around awhile talking after supper. The wolves were howling, and Krebs

said that was a sign the Indians would be in the country. We talked about the Indians awhile, and then went to bed ; we all went to bed about an hour after dark. When we started to go in the house to bed, A. K. Taylor said he believed he would sleep out in the yard, where he could keep cooler. Krebs said, ' No, you must come in the house ; you might take cold by sleeping out doors.' I went in the house and made the beds down on the floor. I and Mary Savage slept together in one bed, Preston and Krebs in another bed, and A. K. Taylor and the little boys in another bed. I and Mary went to bed first, and then the others came in and went to bed. We all went to sleep in a short time. We had been asleep two or three hours ; in my sleep I heard some noise.

" Ben Krebs and I," continued the witness, " both woke up about the same time, and Ben said, ' What in the name of God does that mean ? ' Preston jumped up, and Ben said, ' Preston, don't go out ; it might be Indians.' Preston and Krebs stepped out of the door and listened a few moments. Then Krebs came back, and he and I put on our clothes. Preston came in the house and put on his pants. When Preston and Krebs came in they appeared very much alarmed ; and Preston wanted to know if it was Indians, robbers, or somebody drunk up at the pond, near old man England's. I heard guns in my sleep, and, after Krebs and Preston went out, I heard three guns fire. I tried to wake Mary Savage and Billy Savage up, but could not until it was all over. Ben Krebs, James Preston, A. K. Taylor, and myself all went out doors, to the west end of the house, and stayed there listening about half an hour. I was with them all the time they were out. The children were all in the house ; there was no one else out there with us. While we were out there we thought we heard a woman screaming, but the fice was barking, at old man England's, and the wolves howling so that we could not tell

what it was.   We went back into the house and talked the matter over, and came to the conclusion that it was not a woman, but the fice barking, down at Mr. England's. They both said that, if anything was wrong, why didn't some one come and tell them about it.   Preston said he believed that some one was killed.   Tom Savage, my brother-in-law, came over the next morning and told us that the England family were killed.

" There was a heavy dew that morning, and when Preston went out to get his mare he came back and his pants were wet up to above his knees.   He was always powerful wet when he would go after his mare and come back."

The foregoing is the full testimony of Mrs. Krebs on her direct examination.   In her cross-examination she repeated that Krebs, Preston, A. K. Taylor, and herself were all that went out of the house while the fuss was going on; and added, that, when they came back into the house, Taylor put upon the shelf near the door the pistol afterwards found there by Dr. Stinson; that she told Taylor to be careful and lay it down so it would not fall and hurt somebody; that it belonged to her son, Johnnie Savage, and she saw Taylor, as he went out of the house, pick it up from where Johnnie had put it the evening before; that she had seen Johnnie load it on Friday before, and Taylor told her he had shot one load out of it at a turkey; she also stated that, when Dr. Stinson and others had searched the house, on Monday morning, Mary Savage went out into the yard and got Krebs' shirt, and brought it into the house and gave it to Dr. Stinson; witness saw her bring the shirt in at the front door, in her hand ; and, the shirt in evidence before the jury being shown the witness, she identified it as the same.

Mary Jane Savage, for the defense, testified that she was fifteen years old, and the daughter of Mrs. Krebs.   She gave a similar account to her mother's, but a briefer one, of the movements of the household until they went to sleep ;

a similar account of Krebs cleaning and hanging up the turkeys the day before; and a similar account of Taylor getting his pants wet when he went to get his mare, adding that he always did so when he went after the mare. She stated that some time in the night her mother waked her up and said, "Did you hear that shooting?" She then sat up in bed, but heard no guns.

On cross-examination she said that, when she got awake that night, her mother, Krebs, Preston, and A. K. Taylor were out of doors; she heard them talking. Johnnie Savage was out with them; they all came back in the house and went to bed. When Preston and Krebs came in they seemed badly scared, and said somebody was killed. On Monday, when Dr. Stinson and others came to search for clothes and arms, her mother sent her out to the ash-hopper, where the dirty clothes were kept, to look for Ben Krebs' shirt. But she could not find it among the dirty clothes, and her mother, or somebody, found it in the loft. Witness had not put it there, and was positive she did not take it down out of the loft. She concluded her testimony by stating that her mother, when she woke her up, asked her if she heard the firing, and she replied that she did not. Being recalled, she told about the change of shirts by Krebs on Saturday, and said he slept that night in the clean shirt.

Johnnie Savage, for the defense, gave the same explanation as his mother, Mrs. Krebs, of how Krebs was induced to put on a clean shirt the morning before the murders. Witness accompanied his mother and Krebs to town. When they got back home James Preston was there; he had come there the previous Thursday night, hunting his hogs. Witness heard the howling of the wolves Saturday night, before they all went to bed, and heard some one say it was a sign that Indians were in the country.

Witness was waked up by the firing of guns, towards England's place. Krebs spoke to Preston, and both of them

jumped up and went to the door. Krebs put on his pants; Preston did not. A. K. Taylor and witness went out with them; and they stayed out of doors, at the west end of the house, a half or three-quarters of an hour. Witness' mother, Mrs. Krebs, was not out there. When she got up she put on her clothes and sat down in a chair near the south door of the house, and remained there all the time. She did not go round to the west end of the house at all; no one went around there but witness, Preston, Krebs, and Taylor. When Preston brought his mare up from the pasture his pants were wet up to his waist; he always got them wet when he went after his mare.

On his cross-examination Johnnie said that Krebs waked him and said he heard a noise, and thought it was a horse jumping into the field; Mrs. Krebs said she thought it was a board fell off the smoke-house. Witness went to sleep again, and the next time he awoke was about the time Krebs and Preston went to the door to see what the noise meant. The pistol found· at the house by Dr. Stinson belonged to witness, who, a few weeks before, had traded a hog to Jeff Hagler for it. He loaded it up on Friday, and on Saturday A. K. Taylor shot off one barrel at a turkey.

Anne Savage, for the defense, stated that A. K. Taylor was born in November, 1859, and, at the time of the murder of the England family, was sixteen years and nine months old.

Mrs. E. T. Van Hoozer, for the defense, testified that, in a conversation with Mrs. England after she was wounded, Mrs. England told witness that, if James Preston was present at the time she was wounded and her husband killed, she (Mrs. England) did not know it.

Mrs. Fannie M. Van Hoozer, for the defense, said she heard the dying declarations of Mrs. England, who said that Krebs killed her, and that if James Preston was there she did not know it.

S. J. Poland, for the defense, stated that he heard Mrs. England say that the man she saw cutting her husband's throat was about the size of James Preston.  Being asked if she said James Preston was there, the witness answered, " No."

Gus White and Louis Fisch, for the defense, testified that Krebs had on a clean shirt, going to the town of Montague, on the day before the night of the murders ; they rode in the wagon with him, and noticed his shirt.

Andy Patrick, for the defense, said that on the same Saturday Krebs took dinner with him in the town of Montague, and witness noticed that Krebs had on a clean shirt.

W. H. Grigsby, for the defense, testified that he and his law-partner, Mr. Willis, had been employed by Krebs to defend him against a charge of aggravated assault on William England, and witness had informed Krebs that the highest punishment for that offense was a fine of not less than $100 nor more than $1,000, with confinement in the county jail not more than two years.  Witness also informed Krebs that he might be convicted merely of a simple assault, but that he believed he could beat the case ; that it was arranged for Krebs to bring his witnesses in for consultation on the Saturday on the night of which the murders were committed, but witness couldn't be in town that day. This closed the evidence for the defense.

In rebuttal the state introduced D. D. White, who testified that Krebs, when he came to the town of Montague on the Saturday in question, had on a dirty shirt.  Witness stated his opportunity for observing the shirt, and described the soiled appearances on the shirt ; and to the best of his belief the shirt in evidence, obtained at Krebs' house by Dr. Stinson, was the same shirt worn by Krebs on Saturday, August 26, 1876.

Harvey Taylor, recalled by the state, repeated that the man who presented the pistol at him while lying on the

porch looked like Bill Taylor; and added that he was a tall, slender man, light complexion, and had a rag tied on his head, and was bareheaded; and that the other two men had rags tied on their beards.

The state closed by introducing the written testimony of Johnnie Savage before an examining court which had been held by the county judge. It was very brief, and to the effect that he was at home on the Saturday night of the murders, and knew when the shooting took place; that Preston and Krebs went out, and came back scared and said they were afraid the Indians were killing some one; that the moon was not quite down when they went to bed the last time; that witness slept with A. K. Taylor that night, and woke him up. This concluded all the evidence in the case.

By the defendant's bill of exceptions it appears that he objected to the admission of Mrs. England's dying declarations, because they do not identify A. K. Taylor as the perpetrator of the murder, or show that he was present when it was committed, but tend only to show that other persons not charged in the indictment with Taylor did the killing. He objected also to the evidence of what Krebs and Preston did, and to the testimony about the tracks, for the same reason, and because the record ought not to be incumbered with evidence in regard to parties not named in the indictment, and for whom the defendant on trial could not be held responsible. Also to Mrs. England's declarations about what Susie Taylor said, because not competent for any purpose; and, for like reasons, to the testimony about threats made by Krebs and Preston, and to the introduction of their shirts.

The opinion of this court discloses all other material facts.

*Grigsby & Willis*, for the appellant. The dying declarations of Mrs. Selina England were not competent evidence

in this case.  The defendant objected to the dying declarations being given in evidence against him, because they did not identify him in any way as the person who perpetrated the alleged killing, or show that he was present at the time of the killing, but tended only to show that another person or persons not charged in the indictment did the killing.  This objection should have been sustained. The testimony of all the witnesses who detailed her dying declarations may be examined with punctilious care, and it will nowhere appear that she saw the defendant at the time of the alleged killing.  And, moreover, she does not even speak of there being more than two men present when the killing occurred ; one of these, she said, was Krebs, and the other was "either Preston or a Dutchman that had been there the evening before."  Did she say that A. K. Taylor was there?  And did she say that any other person was there except Krebs and either Preston or a Dutchman? There is no pretense that A. K. Taylor is the Dutchman mentioned above ; and there is no intimation, even, in her dying declarations, that the defendant was engaged in the killing.

Dying declarations have always been held to be competent evidence, under certain rules and restrictions in cases of homicide, where the declarant could name or identify the persons who did the alleged killing ; but we earnestly maintain that in no instance have the courts gone so far as to hold that such declarations are competent where they do not identify the defendant, or allude to him in any way (except this single instance on the trial of this defendant). When the court overruled the objection and held that such declarations were competent, the jury must have been impressed with the idea that they should be entitled to some weight against the defendant, or they would not have been admitted ; and this testimony evidently tended greatly to mislead the jury, and to injure the substantial rights of the

defendant.    The defendant also asked an instruction to the jury embodying substantially what is claimed herein, concerning the admissibility of these dying declarations, and the court refused to give the instruction in any shape whatever.    The dying declarations should have been excluded, and, when they were admitted over the objections of defendant, then the instruction in regard to them asked for by defendant should have been given to the jury; and, for the error committed by the court in the above rulings, a new trial should have been granted.

Besides, the proper foundation was not laid for the admission of these declarations. "The dying declarations of a deceased person may be offered in evidence either for or against a defendant, under the restrictions hereinafter provided.    To render the declarations of the deceased competent evidence it must be satisfactorily proved (1) that, at the time of making such declarations, he was conscious of approaching death, and believed there was no hope of recovering; (2) that the declaration was voluntarily made, and not through the persuasion of any person; (3) that such declaration was not made in answer to interrogatories calculated to lead the deceased to make any particular statement; (4) that he was of sane mind at the time of making the declaration." Pasc. Dig., art. 3125; Lister v. The State, 1 Texas Ct. App. 739.    None of the above preliminary facts were established in this case except, perhaps, the last (for some of the witnesses seem to claim she was in her right mind when she made the declarations), but they completely fail to establish the preliminary requirements embodied in the first three subdivisions above quoted.

The fourth and seventh assignments will be considered together.    These are in regard to the evidence against Preston and Krebs.    Any one who will take the trouble to read the statement of facts in this case will say at once that Preston and Krebs were tried, instead of A. K. Taylor; and

it must be remembered, too, that no one is charged in the indictment with the offense except the defendant.  The dying declarations are all concerning Krebs and Preston ; the circumstantial evidence is, nearly all of it, concerning them ; the shirts introduced in evidence were theirs, and the threats and quarrels were the language and acts of Krebs.  Preston and Krebs were tried, and A. K. Taylor was found guilty.  The defendant, in order, if possible, to prevent the jury from being misled by all this evidence concerning Krebs and Preston, asked the court to give this instruction :  " That neither Ben Krebs nor James Preston are charged in this indictment with the killing of Selina England, nor are they on trial for said offense ; and you will not be warranted in convicting this defendant because you may believe from the evidence that Ben Krebs and James Preston are guilty, unless you are convinced also, therefrom, that the defendant was with said Krebs and Preston, and participated in the commission of the offense charged."  This instruction the court refused to give, and the jury retired with the evident belief that, although Krebs and Preston had been tried (according to the evidence), they were at liberty, if they saw proper, to send the defendant to the pentientiary for life.

Selina England's dying declarations as to what Susie Taylor said about the killing should not have been admitted.  The dying declarations, as we have before shown, were not competent, and there is still stronger reasons for not admitting what it is claimed that Susie Taylor said.  We do not believe that any court of last resort has ever held that what persons said, other than those who perpetrated the homicide, is admissible as part of a dying declaration.  We have looked in vain for any such authority, and are led to the inevitable conclusion that to admit such evidence is making too great an innovation upon the inflexible rule forbidding the introduction of hearsay evidence.

The court erred in permitting the witnesses for the state to testify to threats made by Ben Krebs against William England, Selina England and Isaiah D. Taylor, and to difficulties between Krebs and the England family. A. K. Taylor, the defendant, never made any threats against any of the parties killed, nor did he ever have any difficulties with any of them; and he was never present when any difficulty occurred between Krebs and the England family; nor did he know of any threats being made by Krebs which it is proved were made. Hence to admit such evidence against the defendant is in conflict with all the authorities on the subject. "The declarations of a prisoner made at a former time are admissible where they tend to prove the intent of the party at the time of the commission of the offense. Thus, on an indictment for murder, evidence of former grudges and antecedent menaces may be given to show the prisoner's malice against the accused." Roscoe's Cr. Ev. 71; 1 Ph. on Ev. 169. But none of the elementary writers on criminal evidence have ever sanctioned the proving of threats, made by parties not charged in the indictment, for any purpose; and especially where such threats were made in the absence of the prisoner, and without his knowledge or sanction, as was done in this case. This is not an open question in this state, but has been settled by our Supreme Court in *Wright* v. *The State*, 43 Texas, 174. In the case at bar the court permitted the prosecution to call a host of witnesses to show bad feeling and threats between Krebs and the murdered family; and no attempt was made to connect the defendant with such unfriendly feeling — the defendant all the while objecting to the evidence and urging that it was incompetent. The defendant finally asked the court to instruct the jury on said point as follows, viz.: "That any threats that Ben Krebs may have made at any time against Selina England or William England, in the absence of this defendant,

cannot be considered by you to show malice of this defendant against said persons, or for any other purpose, against the defendant in this case. The defendant is not legally responsible for what any other person may have said against Selina England or William England, if he was not present and sanctioned such threat, or knew nothing about the using of such language by any such party against said Selina England or William England. '' This instruction was refused. The defendant then asked for a new trial because the court had admitted this incompetent evidence against him, and this was refused. By admitting this evidence concerning Krebs' threats and difficulties, over defendant's objections, and then refusing the instruction above set forth, the defendant's rights were greatly prejudiced, and the court should have sustained his motion for a new trial.

There is error in the charge of the court. The defendant is alone indicted, in this case, for killing Selina England of his express malice and with a certain pistol; he is charged as a principal with doing the shooting and killing, and there is no allusion made in the indictment to Ben Krebs, James Preston, or any one else, as being the guilty perpetrators of the crime charged. In the court's charge, after instructing the jury that they might find the defendant guilty if they believed from the evidence that he shot and killed Selina England, in Montague county, of his express malice, on any day prior to the time the indictment was presented, he then added this language, which we deem objectionable for the want of any allegation in the indictment upon which to base it, to wit: '' or if you believe that the said Selina England was at such time and place killed by some other person or persons, with their express malice aforethought, and if you further believe that the defendant, A. K. Taylor, was present, and, knowing the unlawful intent of the person or persons engaged in such shooting, did aid such person or persons by acts, or encour-

age them by words or gestures, in the commission of such offense, you will find the defendant guilty of murder in the first degree," etc.   The part of the charge above quoted and marked with quotation marks is entirely without any allegation in the indictment to support it, and is, therefore, erroneous.   If the judge is allowed, under our practice, to first charge the law as applicable to the case made by the allegations in the indictment, and then draw on his imagination, and present a charge to the jury giving them a case of a different kind, why, then the state would only need a judge with a vivid imagination to supply the law to meet the demands of a defective indictment and a badly managed prosecution.   But such, we think, is not the province of the court; he can only charge the law applicable to the case made by the allegations in the indictment; and for the charge above quoted to have been applicable to this case there should have been a count in the indictment alleging that some person or persons to the grand jurors unknown did the killing, and that this defendant was present, and, knowing the unlawful intent of such unknown person or persons, aided them by acts and gestures in the alleged killing.

The motion for a new trial should have been sustained. Said motion embodies substantially the same points heretofore considered in this brief, with the exception of one, which we will now consider; it is that the verdict is contrary to the law and the evidence.   The verdict is severe; it finds the defendant guilty, and assesses his punishment to confinement in the penitentiary for life.   And, when the statement of facts accompanying the record is carefully examined, we think this court will at once conclude that there is no evidence to support said verdict.

*George McCormick*, Assistant Attorney General, for the State.   The question raised by counsel in their third bill of

exceptions need only be noticed to say that counsel labored under a mistake of law in believing that, because appellant and Krebs and Preston were not indicted in the same bill or tried at one time, the dying declarations of Mrs. England were not evidence against him. If the testimony showed that Taylor was present, knowing the unlawful intent of Krebs and Preston, and aided by his *acts* or *encouraged* by *words* or *gestures*, or if he, being present at the place of the murder, advised or agreed to the commission of the crime, he is certainly equally guilty with them. And, the state having shown he was present and did aid, encourage, and assist his confederates, it was certainly competent to show all the circumstances and facts connected with the commission of the crime, and the dying declarations were then part of the *res gestæ.*

If the fact of conspiracy was shown during the trial, it makes no difference at what time appellant entered into such agreement; for every one who enters into a common purpose or design is generally deemed, in law, a party to every act *which had before been done* by the others, and a party to every act which may afterwards be done by any of the others, in furtherance of such common design. 1 Greenl. on Ev., sec. 111, and note; 3 Greenl. on Ev., sec. 94.

The case of *Wright* v. *The State,* 43 Texas, 170, referred to by appellant's counsel in support of his argument on the proposition discussed, is not in point. In that case the evidence of the accomplice who testified was not corroborated, and there was no evidence connecting Wright with the murder. Indeed, Justice Reeves states in the opinion that "no fact was stated by any other witness showing any connection of Wright with the murder itself or its perpetrators, whoever they may have been." And, also, that opinion states there was no evidence of a conspiracy, and nothing connecting Wright with the parties, etc.

In the case at bar the evidence both for the state and defense shows Taylor was with Krebs and Preston on the night of the murder; that they were within one-half mile of the place of the murder; that they were trailed directly from the scene of the killing back to the place they were shown to have been before. The witness Harvey Taylor saw three men, one of whom he described as appellant; the testimony of Mrs. England, given in her dying declarations, is fully corroborated by the tracks, the position of the dead bodies, etc.

The defense is an *alibi*, and, if a good one, applies equally to Krebs and Preston. If Taylor is not guilty, neither are they. Is it possible that the persons who made the tracks did not commit the crime? If the tracks made by Krebs, as he ran after the fleeing and helpless women, were the tracks of their murderer, then those three distinct and separate sets of tracks made by the parties, leading from England's house to Krebs', show beyond a doubt that appellant was present, consenting to and assisting in the perpetration of this most strange and unnatural murder.

WINKLER, J. The record discloses the following with regard to the special *venire* from which the jury were selected for the trial of the appellant, and to the manner of impaneling the jury, to wit:

" In this case the special *venire* of sixty men ordered for the trial of this cause was drawn by the clerk, in open court, from a box into which had been placed, on separate slips of paper, the names of all the jurors selected by the jury commissioners for this term of the court; and said jurors were summoned, and, in impaneling the jury for the trial of the cause, the name of the first juror on the list was called and accepted by the state, and the defendant was called upon to pass upon the juror."

The above is an extract from the defendant's first bill of

exceptions.   To the manner of forming and impaneling the
jury two bills of exception were taken by the defendant,
and are set out in this transcript.   In the first it was in-
sisted that the clerk should write the names of the jurors on
the *venire* upon tickets of paper (after they were passed
upon for cause), and draw them from a box, and write them,
as drawn, upon two slips of paper, and deliver one to the
prosecuting attorney and the other to the defendant, in order
that each might strike therefrom the number of their per-
emptory challenges ; which method of procuring the jury
the court at the time refused to allow, and to which the
defendant at the time excepted.

In the second bill of exceptions it is stated that, in im-
paneling the jury in the case, the court ordered that one
juror on the *venire* be called and placed in the jury-box at a
time, and that the state and the defendant each be required
to pass upon said juror for cause, and peremptorily, before
the calling of another juror.   To this method the defendant
at the time objected, claiming that, if the jury were to be
gotten in this way, the panel should be filled by placing
twelve jurors in the box, and that, in case a juror was set
aside for cause or peremptorily, another should immediately
be called and placed in the box, before the parties should be
required to further challenge.   The court overruled said
objection, and compelled the defendant to pass upon each
juror as called, without having the benefit of a full panel ;
to which the defendant at the time excepted.

The mode by which the names of the persons summoned
on the special *venire* were obtained was the mode pointed
out by section 23 of this jury law of August 1, 1876.
Acts Fifteenth Legislature, 82.   It is believed that the
provisions of section 22 of the jury law have reference
to the formation of juries for the trial of other than capital
cases, and not to cases in which a special *venire* may be
required.   This view is strengthened by the fact that by the

subsequent section of the act special provision is made with reference to special *venires*.

It is insisted on the part of the appellant, in effect, that the jury law of 1876 repeals all former laws upon the subject of selecting and impaneling juries. From an examination it will be found that only such laws and parts of laws are repealed as are in conflict with the act in question. See sec. 29, p. 84.

In so far as the act lays down a rule for obtaining a jury in any particular case, or in so far as the manner of impaneling a jury may be prescribed by the last act, former laws would be repealed or superseded by the latter. This act of 1876 has one provision with regard to the manner of selecting those persons who are to be summoned on a special *venire;* and, to the extent this law has provided, it, being the last expression of the legislative will, must control all former laws in conflict with or repugnant to its provisions, but no further. All laws *in pari materia* must be construed together as parts of the same law, when not inconsistent.

Giving, then, full force to section 23 of the act under consideration, there is nothing contained in it in conflict with several of the provisions of the Code of Criminal Procedure, or which would, by any known rule of construction, render them inoperative. It will not be presumed, in the absence of any direct provision on the subject, that all the previous provisions with regard to the manner of summoning, and of making service of a special *venire* on the defendant, including the length of time the accused must be served therewith before he can legally be brought to trial, have all, or any of them, been repealed or superseded by the enactment of the latter act. Repeals by implication are not favored.

We are of the opinion that article 556 of the Code of Criminal Procedure ( Pasc. Dig., art. 3024) is not in conflict with the 23d section of the act of 1876, for the reason

that this article provides the manner of forming and im-
paneling a jury in a capital case, when the last act does not;
and so the two are not in conflict.  This article directs, in
forming a jury for the trial of a capital case: "The names
of the persons summoned shall be called in the order they
stand upon the list, and, if present, shall be tried as to their
qualifications, and, unless challenged, shall be impaneled."
They must be called one at a time as they stand upon the
list; as each juror is called he is first tested as to his quali-
fications to sit as a juror in that particular case; if not quali-
fied, he is stood aside for cause; but if qualified, there
being no cause for challenge, he is then passed on, first by
the state and then by the defendant, and, if not peremptorily
challenged by either, shall, in the language of the Code, be
impaneled; and so on until the number, twelve, be ob-
tained.  *Horbach* v. *The State*, 43 Texas, 242.

There was no error in the formation of the jury as set
out in the record.

The other propositions embraced in the several bills of
exception set out in the transcript relate to what we deem
to be a misapprehension of the law of the case, namely,
that, because no other person was joined in the indictment
with this defendant, no evidence was admissible which
affected the appellant, unless such evidence related especially
to him; when the true question was, not who had been
indicted for, but who participated in, the commission of the
offense.

Mr. Greenleaf says, upon the support of several adjudi-
cated cases: "The evidence in proof of a conspiracy will
generally, from the nature of the case, be *circumstantial*.
Though the common design is the essence of the charge, it
is not necessary to prove that the defendants came together
and actually agreed in terms to have that design, and to
pursue it by common means.  If it be proved that the
defendants pursued by their acts the same object, often by

the same means, one performing one part and another another part of the same, so as to complete it, with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect the object.  Nor is it necessary to prove that the conspiracy originated with the defendants, or that they met during the process of its concoction; for every person entering into a conspiracy or common design already formed is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design." 3 Greenl. on Ev., sec. 93.

This language with reference to conspirators applies with equal force, under our law, when those usually denominated conspirators in the books are here principals or principal offenders, and all are such in either of the following cases, to wit:

"In law all are principals who are guilty of acting together in the commission of an offense.  When an offense is actually committed by one or more persons, but others are present, and, knowing the unlawful intent, aid by acts or encourage by words or gestures those actually engaged in the commission of the unlawful act, or who, not being actually present, keep watch, so as to prevent the interruption of those engaged in committing the offense, such persons so aiding, encouraging, or keeping watch are principal offenders, and may be prosecuted and convicted as such. And any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act."    Penal Code, arts. 214, 215, 218; Pasc. Dig., arts. 1809, 1810, 1813; *Hampton* v. *The State*, 1 Texas Ct. App. 655.

The judge who presided at the trial of the appellant fully comprehended the law of the case and the liability of the accused, and gave to the jury proper instructions agreeably

to the evidence, and did not err either in the admission of testimony, or in charging the jury, or in refusing to give the charges asked by the accused as we find them severally set out in the record. Especially was this the case where the jury were instructed, among other things, as follows :

" Though the jury may from the testimony believe that the said Selina England was murdered by Ben Krebs and James Preston, or either of them, yet, to warrant the jury in finding the defendant, Taylor, guilty, you must believe that the defendant was present, and aided, advised, or assisted them in such killing."

On the subject of circumstantial evidence the jury were charged as follows :   " To warrant a conviction alone upon circumstantial evidence, the circumstances relied upon, taken together, must be of a conclusive nature, leading, on the whole, to an absolute certainty in the minds of the jury that the defendant is guilty beyond a reasonable doubt."

The charge of the court was a full, clear, and plain statement of the law of the case as made by the evidence, and every view expressed was as favorable to the defendant as the testimony warranted.

The charges refused were given in the general charge, so far as applicable.

The defendant had the benefit of a proper charge as to the presumption of innocence and the reasonable doubt, and as to the duty of the jury in case they should determine from the evidence that he was under seventeen years of age at the time the offense was committed ; which the jury gave him.

There was some conflict in the evidence. On this subject the jury were instructed as follows :   " You are the exclusive judges of the weight of the testimony and the credibility of the witnesses."

For anything we find in the record, we are forced to the conclusion that the accused has had the benefit of a fair

and impartial trial, and has been legally convicted of the crime charged against him; and whilst we are not unmindful of the severity of the punishment imposed, the law, if guilty, could not have imposed a lighter one. We find no cause to disturb the judgment.

The judgment is affirmed.

*Affirmed.*