## H. H. Hudson *v.* The State.

1. Murder — Evidence. — The defendant in a murder trial cannot put in evidence the dangerous or desperate character of the deceased in justification, but he may prove it in excuse for the killing, provided he first shows that the deceased manifested a purpose of attacking him, and he was aware of the dangerous character of the deceased.

2. Practice. — The judge of a trial court, being sufficiently advised of the law of the case, may decline to hear the reading of an authority with which he is familiar; and is authorized to restrict the reading of an authority, in argument to the jury, to so much thereof as illustrates the question in dispute.

3. Charge of the Court — Adequate Cause. — The charge of the court upon the law of manslaughter, in defining "adequate cause" as arising from the use of insulting language towards a female relative by the deceased, substantially instructed the jury that such language, unless it was used in the presence of the female, did not constitute "adequate cause" within the meaning of the statute. *Held,* error; the statute does not so limit the use of insulting language, etc., as "adequate cause." See the opinion for the question discussed.

Appeal from the District Court of Bell. Tried below before the Hon. L. C. Alexander.

The indictment charged the murder of J. J. Crow. The conviction was for murder in the second degree, and the penalty imposed was ninety-nine years in the State penitentiary.

The dying declarations of the deceased, made without solicitation, and in anticipation of death, were testified to by several witnesses. The substance of them was, that on the evening of the 1st of April, 1879, the deceased started to Dr. Russell's for medicine for his sick family. His route lay by the school-house where the defendant was teaching. School was in session, and the deceased saw the defendant in the school, as he was passing. From Dr. Russell's he went to Little River City, and when he stepped into Fletcher's store he saw the defendant. He was somewhat surprised, as it was early, and the defendant usually dismissed school quite late. From Fletcher's store the deceased went on to Hale & Wilson's saloon, to get a bottle of whiskey. While in the saloon, and behind a partition, talking to Hale and Dave Robertson, the defendant came in and looked behind the partition. Presently the deceased came from behind the partition, bought his whiskey, and himself and Robertson, who lived in the same direction from the town, got on their horses and started home. They had travelled some little distance when, looking back, they saw defendant coming towards them. Defendant rode up on the side of Robertson, and the three rode on abreast until they reached a point in the road where Robertson's route diverged. At this point Robertson took a drink from deceased's bottle, and left the parties. The defendant declined to drink. Deceased then remarked, " If we can't drink together, we can ride together ;" to which the defendant assented, saying that he never refused to ride with any one. The two rode on together, in friendly discussion of the school matter about which they had previously disagreed. When near Thornton's residence, defendant checked up his horse, and, as the deceased turned his face

to observe the cause, he received a shot in the right side of his face. Deceased fell, and for some time remained unconscious, but finally recovered sufficiently to reach a neighbor's house, from where he was taken home.

The evidence of the deceased, taken at the preliminary trial of the defendant, upon a charge of assault with intent to murder, comports with the above; but adds that, when discussing the school matter, the defendant asked him why he thought that he (the defendant) "had not treated him (the deceased) right;" and he answered, "I know you are no school-teacher, in the first place, and you have married a prostitute." He did not at that time say to defendant, "God d—n your soul, I will bring you to time yet."

The witness Wilson corroborates the statements as to what occurred at the saloon, and the witness Robertson made the same statement of the occurrences from the time the deceased entered the saloon until they separated at the forks of the road.

Thomas Clegg testified, for the defence, that in the preceding February the defendant and the deceased met at a party in the neighborhood, and engaged in a quarrel. The deceased asked the defendant if he had said that he had arrested his (the deceased's) father for horse-stealing,— following up this question with the statement that, if so, he had told a d—n lie, and he would kill him for it. Defendant answered that he had arrested one Zeke Crow for horse-theft, and that if deceased had a brother of that name, then he had said it. Deceased responded that he had told a d—n lie,— that he had never arrested a man named Zeke Crow.

The testimony of this witness is corroborated by Jasper Wiley, who testified, in addition, that on the second Saturday of the previous March the deceased read a letter to him, and asked him if he had ever heard defendant say any thing about him. Being answered in the negative, the deceased then said, "Hudson and I cannot live in the same country."

Another witness detailed the quarrel between the deceased and the defendant at the party, in substance as above set out. These statements are disputed by A. J. Smith. Smith testified that he went with deceased to the house of Shaver, where the party was given (not knowing there was to be an entertainment), to see Shaver about a report that the defendant had told him that he had arrested deceased's father for horse-stealing. Witness went with deceased, at his request, to hear what might be said. On their return homeward, they met the defendant near the fence. Deceased asked the defendant there if he had circulated such a report. Defendant answered that he had arrested the father of one Zeke Crow for that offence, and that if deceased had a brother of that name, then he had arrested his father for such offence. Deceased merely answered that defendant had " better go slow " when he slandered his old father, who had been dead forty-two years, and before defendant was born. He did not threaten to kill defendant. If such threat had been made, witness would have heard it. It was in evidence that deceased was one of the school trustees.

The opinion discloses the matters immediately involved in the rulings.

*Boyd & Holman*, for the appellant. The court erred in refusing to allow the defendant to prove, by R. P. Talley and others, that the deceased was a man of dangerous character. The character of the deceased should have been submitted to the jury, as the defendant was clearly entitled to the benefit of this proof. The defendant was entitled to prove the fact that the deceased was a dangerous man, and a quarrelsome and insulting man, drunk or sober, and had made threats against defendant. Pasc. Dig., art. 2270. See *Bingham* v. *The State, ante,* p. 169.

The court erred in not allowing counsel for the defendant, in the argument, to read to the jury, as a part of his

argument, the case of *Marshall* v. *The State*, 33 Texas, 664 *et seq*.

The court erred in not permitting the defendant's counsel to read as a part of his argument the case of *Horbach* v. *The State*, 43 Texas, 242. The court informed counsel for the defendant that the counsel could read so much of the opinion as related to the facts in the case, and was informed by counsel that the questions of law and fact were so minutely blended in the opinion of the court that it was impossible to separate them.

The court erred in the eighth paragraph of his charge to the jury, in charging that "insulting words of, about, and concerning a female relation, who is not present, are not insulting words *towards* a female relation, as used hereinbefore, and would not necessarily be adequate cause as fixed by the law, when the proof showed that the deceased had used insulting words about defendant's wife at the time of the homicide." The jury were certainly misled by this charge, as they, under this charge, were not allowed to consider the insulting words used towards the appellant's wife, by the deceased, at the the time of the homicide.

This charge is certainly not the law. If so, then there would be no mitigation for any violence used towards a person whose vile tongue breathed poison and slander against the chastity and virtue of the wife, in a public place, and in presence of a vast multitude, if she was not present to hear it. If this charge be the law, then the deceased, Crow, could tell the appellant, as he did, that the appellant had married a prostitute; and then, if he felled him to the ground, there was to be no mitigation for the act on account of the insulting words about a female relation. If this be the law, then the statute should be changed so as to read : "Insulting words or conduct of the person killed to (and not towards) a female relation of the party guilty of a homicide." Pasc. Dig., art. 2254; *Biggs* v. *The State*, in Hor. & Thomp. on Self-defence, 746.

*Thomas Ball*, Assistant Attorney-General, for the State.

ECTOR, P. J.   The defendant was indicted by the grand jury of Bell County, for the murder of J. J. Crow.   He was tried, found guilty of murder in the second degree, and his punishment assessed at confinement in the penitentiary for ninety-nine years.

Defendant filed a motion for new trial, and in arrest of judgment, which were overruled, and he has prosecuted an appeal to this court.   We will briefly refer to such portions of the evidence as we deem necessary to a proper discussion of the questions presented in the record, and on which the defendant relies for a reversal of the judgment.

The evidence shows, beyond all question, that the prisoner killed the deceased.   Defendant was a school-teacher in Bell County, and deceased was one of the trustees of the school.   These parties had been unfriendly for several months.   Some time in January last, there was held what is termed in the statement of facts a school meeting, in the school-house where defendant kept school.   The defendant and Crow were there.   Defendant asked Crow to explain something he had said about his family.   Crow refused to explain any thing about it, and said that "this was not the place; some other time would do."   Shortly after this, Crow, in company with a friend, called on the defendant in regard to certain remarks which he had been informed Hudson had made about his (Crow's) father.   Crow asked defendant what he had said about arresting his (Crow's) father for horse-stealing.   Defendant told him that he had said he arrested Zeke Crow for horse-stealing, and that he had not arrested his father for horse-stealing, unless his father had a son named Zeke Crow.   Crow said it was a d—d lie; and some of the persons present say that he threatened to take the life of defendant.   On the 1st of April, 1879, Crow left home, going to see Dr. Russell, who lived in Little River City, to get some medicine for a sick family.

His route was by the house where defendant was engaged, as he passed, in teaching school. Crow stopped at the house of Dr. Russell a short time, and then went to a store to buy a bottle of whiskey, and saw Hudson in Little River City. Crow left there in company with the witness Robertson, and both of them travelled the same road a part of the way home. After Crow and Robertson had ridden a short distance, Hudson caught up with them, and the three rode along together until the road forked, one part leading to Robertson's home and the other to Crow's, *via* Thornton's house, where Hudson was boarding. Crow, before separating from Robertson, pulled out his bottle of whiskey and asked him to take a drink, which he did, as the three were halted in the road. Crow also invited Hudson to take a drink, and he declined, saying he never drank. Robertson here parted with Crow and Hudson. Crow then said to Hudson, if they could not drink together, they could ride together. Hudson said, all right, — that he never refused to ride with any body; and the two rode off together. After they had ridden some distance Crow testified that defendant pulled out his pistol, and fired suddenly and unexpectedly upon him, shooting him in the right side of the face, in his temple; that when he was shot he fell off of his horse, and lay insensible for some time; and finally, when he came to his senses, succeeded, after much delay, in making his way to a house about a fourth of a mile distant.

Counsel for the prosecution read, on the trial, the testimony of Crow, given in evidence before a justice of the peace sitting as an examining court, where the matter under investigation was the shooting of Crow by defendant, from which we make the following extract, to wit: "After riding about a quarter of a mile, the subject regarding the free-school, about which we had had some trouble, was raised. I was a trustee of the school community. No angry words passed between us. I told him I did not

want any trouble about it.  We had no quarrel before he shot me.  Defendant asked me, on the road, if I thought I could 'get away with him.'  I said, 'No; I did not want to harm any one.'  We had been riding side by side until we neared the place where I was shot.  *  *  *  The defendant checked his horse, which threw him about half the length of his horse in my rear.  I turned my face towards him, and saw him throw up his right arm.  I immediately heard the report of a pistol.  I fell from my horse after I was shot.  *  *  *  I was powder-burnt on the right side of the face, — the side on which I was shot, — by the firing of the pistol.  The ill-feeling of the defendant towards me has existed for about three or four months.''

Crow, on cross-examination, also testified that, '' I did not say, in the conversation referred to in direct examination, 'Hudson, you have not treated me right.'  Defendant asked me why I thought he had not treated me right.  I told him I knew he was no school-teacher, in the first place ; and he had married a prostitute.  I did not say to defendant, 'God d—n your soul, I will bring you to trouble yet.' ''  Crow was shot about dusk in the evening of the 1st of April, 1879, and the shot produced his death on the 13th of the same month.

On the trial of the cause in the District Court, after the defendant had introduced all his evidence, which is set out in the statement of facts, his counsel stated to the court he had no testimony to offer to show that Crow had done any act manifesting an intention to injure the defendant at the time of the alleged homicide ; and then asked R. P. Talley, one of the defendant's witnesses, the following question : '' Was J. J. Crow a man of dangerous and violent character ? ''  To which the counsel for the State objected ; which objection was sustained by the court, because, in view of the evidence adduced, and the above statement of the counsel of defendant, said evidence was irrelevant and immaterial.  We do not think the court erred in this ruling.

It is a good general proposition that the character of a person does not justify a taking away of his life, when the act would be otherwise unjustifiable. Yet there are exceptions to this general rule. The general character of deceased for violence may be proved when it would serve to explain his actions at the time of the killing. The actions which it would serve to explain must first be proved, before it would be admissible as evidence. The Supreme Court of Louisiana, in the case of *The State* v. *Robertson*, 30 La. An. 340, say: "The defendant, who is on trial for murder, cannot introduce evidence of the quarrelsome or dangerous character of the deceased, in justification; but he may introduce evidence of such character in excuse for the killing, provided he first shows he was actually attacked by the deceased, and that he was aware of the latter's character." However bad and desperate the character of the deceased may have been, and however many threats he may have made, he forfeits no right to his life, until by an actual attempt to execute his threats, or by some act or demonstration at the time of the killing, taken in connection with such character and threats, he induces a reasonable belief on the part of the slayer that it is necessary to deprive him of life in order to save his own, or to prevent some serious bodily injury from being inflicted upon his person. *Stevens* v. *The State*, 1 Texas Ct. App. 591; *Horbach* v. *The State*, 43 Texas, 254; 1 Whart. Cr. Law, sect. 641; 2 Bishop's Cr. Law, 625–630.

We believe the court did not err in refusing to permit the counsel for defendant to read in his argument, on the trial of the cause, the cases referred to in defendant's second and third assignments of error. It appears that counsel for defendant offered to read to the court below the case of *Marshall* v. *The State*, 33 Texas, 664, which the court declined to hear, because it was sufficiently advised of the law of the case. Counsel for defendant also offered to read to the jury the case of *Horbach* v. *The State*, 43 Texas, 242,

when the court stated that counsel might read so much of the same as illustrated this case or discussed the weight of evidence. Whereupon the counsel proposed to read the whole of the case to the jury which the court refused to hear, because the court was fully advised, and understood and remembered said case.

The extent to which counsel may read from legal authorities, or from works of general science, rests within the sound discretion of the court, and the manner of exercising this judicial discretion will not be revised on appeal, except in a clear case of its abuse. It has been held, both by the Supreme Court and this court, that it is better for the protection of the rights of the parties that the exercise of this privilege should be regulated by judicial discretion than that it be left to the unlimited discretion of counsel, governed by the powerful motives of interest and ambition. See *Dempsey* v. *The State*, 3 Texas Ct. App. 429 ; *Hines* v. *The State*, 3 Texas Ct. App. 483, and authorities there cited.

The fourth assignment of error is, that " the court erred in the eighth paragraph of his charge to the jury." This assignment presents a question which, we believe, has never before been passed upon by a court of last resort in this State, and upon which there is quite a difference of opinion among many of our best lawyers. In order fairly to present the question here made, we will copy the seventh and eighth paragraphs of the charge, which the court gave as instructions to the jury on the law of manslaughter : —

" 7. By adequate cause is meant such as would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. Insulting words or gestures are not adequate cause, in the legal meaning of said phrase. Insulting words or conduct of the person killed, towards a female relative of the party guilty of the homicide, is adequate cause, provided the killing took place

immediately upon the happening of the insulting conduct or words, or as soon thereafter as the party killing may meet with the person killed, after having been informed of such insults, and provided such insulting words or conduct were the real cause of the killing, and produced the state of mind above described in subdivisions 6 and 7 of this charge.

" 8. But insulting words of, about, and concerning a female relative who is not present, are not insulting words ' towards' a female relation as used herein before, and would not necessarily be ' adequate cause' as fixed by the law; but, if a person used insulting words to another about a female relation of the latter, and in the opinion of the jury the words are such as would commonly produce a degree of anger, rage, or resentment in a person of ordinary temper, sufficient to render the mind incapable of cool reflection, and such condition of mind is thereby produced, and such second person, at the time of such provocation, killed such first person, the act would be manslaughter."

We believe that the first part of the eighth subdivision of the charge of the court was not a correct enunciation of the law, and was well calculated to mislead the jury. In telling the jury " that insulting words of, about, and concerning a female relation who is not present are not insulting words ' towards' a female relative as used herein, and would not necessarily be adequate cause as fixed by the law," we think the court committed an error. In our judgment, the Legislature never intended, in subdivision 4 of art. 2254, Paschal's Digest, to restrict the insulting words of the person killed, "towards" a female relative of the party guilty of the homicide, to remarks made to her or in her presence, but intended to include insulting words about a female relative, whether she was present or absent.

Mr. Webster, in his Unabridged Dictionary, gives " toward," when used as a preposition, the following meaning, to wit: " Toward — 1. In the direction to. 2. With direction to; in a moral sense, with regard to, re-

garding. 3. With ideal tendency to. 4. Nearly.'' If the Legislature had intended that such insulting words must be used by the deceased to or in the presence of the female, in order to reduce the killing to manslaughter, some other word than '' towards,'' and one that would have better expressed the idea, would have been used in the statute. It appears clear to us that, on the plainest principles of justice and reason, it could make no difference, so far as the provocation is concerned in this instance, whether the deceased told the wife of the defendant that she was a prostitute, or her husband that he had married a prostitute. The extent of the transport of passion, to extenuate the guilt of the homicide, would be as great in the one case as in the other. And in every case when such a defence is relied on to reduce the killing to manslaughter, the jury must be at liberty to determine whether, under all the circumstances, the insulting words were the real cause which provoked the killing. The court did not err in overruling defendant's motion in arrest of judgment.

As this case must be reversed on account of the error in the charge of the court, it is unnecessary to notice the other assignments of error; they will not likely occur on another trial.

The judgment of the District Court is reversed and the cause remanded.

*Reversed and remanded.*