[No. 2723.]

## James Williams v. The State.

1. MURDER—PROOF THAT DECEASED WAS REPUTED TO BE A VIOLENT AND DANGEROUS MAN.—When there is evidence tending to show that the accused committed the homicide in self-defense, or under reasonable apprehension that his life was in danger, or that he was in danger of serious bodily harm, by reason of some act of deceased indicating an intention to kill or to do serious bodily harm, or tending to show that he acted under the influence of passion and without deliberation, he is entitled, in explanation, extenuation or justification of his acts, to prove the general character of the deceased to be that of a violent and dangerous man, or the general character of the deceased in any other respect which would tend to determine the grade of the homicide by showing the intent actuating the accused in its commission. Note a state of case in which it was error to exclude such evidence, whether it would or would not have affected the verdict.

2. SAME—CHARGE OF THE COURT.—To prove that it was the accused who killed the deceased, the prosecution put in evidence a voluntary statement made by the accused immediately after the homicide, to the effect that he killed the deceased, and had to do so in self-defense, because the deceased was assailing him with a knife. *Held*, that the jury should have been instructed· that a person unlawfully attacked with a deadly weapon is not bound to retreat in order to avoid the necessity of killing his assailant.

APPEAL from the District Court of Colorado. Tried below before Wells Thompson, Esq., Special Judge.

The indictment charged the appellant with the murder of Benjamin Brooks, in Colorado county, Texas, on the twenty-eighth day of November, 1882. His trial resulted in his conviction of murder in the first degree, with a life term in the penitentiary assessed against him as punishment.

Henry Williams, a brother-in-law to Benjamin Brooks, was the first witness introduced by the State. He testified that the deceased came to his death in Colorado county, Texas, on the twenty-eighth day of November, 1882, from a gun shot wound. The ball passed through the left arm of the deceased and entered his left side. Deceased at the time of his death was living on the McBroom place. The witness at that time lived on the Pinchback place. William Usher, the half-brother of the defendant, lived on the same place, about two hundred yards distant from the witness, and the defendant lived with him. The Pinchback place is about six miles from Columbus, in Colorado county. The deceased was a married man, but he and his wife, Alice Brooks, had not lived together for two or three months at the time of the killing. The body of the deceased was found, on the night he was shot, lying in the road on Lake prairie, about six hundred yards from where he lived, about one mile from where the witness lived, and about three-quarters of a mile from where Alice Williams lived.

Just after dark on the evening of the killing, the defendant came to the house of the witness, and said to Rhoda Williams, wife of the witness and sister of the deceased: " You had better go down on the Lake prairie road and see about your brother Brooks, as I have shot him." No attention was paid to this advice, as no one believed the statement of the defendant. The defendant then went on to the house of his brother, William Usher, some two hundred yards distant. After a short time he returned to the house of the witness and called for Rhoda Williams, and told her that it was true that he had shot her brother Brooks, and that she had better go and see about him. Shortly after this, Henry DeGraffenreid came to the house of the witness, and reported that he had seen Ben. Brooks lying dead by the side of the road on Lake prairie. Thereupon, with the view of arresting the defendant, whose horse at that time was hitched at Usher's house, the witness and others went near to the house and watched the house, but the defendant at no time came near it.

Some one went to Columbus to notify the officers of the killing, and about midnight Mr. George B. Crawford, the constable of precinct number one, arrived with a jury of inquest, and the witness and his wife Rhoda went to the body. A great many were present when the witness, his wife, Mary Brooks and Manuel Johnson got to the body. No knife, pocket-book or money

was found on the body. The clothes were not powder-burned. When the defendant came to the house and told Rhoda Williams that he had killed her brother, he did not say why he had done so. No one of those at the witness's house went to where DeGraffenreid said the body lay until Mr. Crawford reached the house. All were asleep at that time. The witness identified the defendant on trial as James Williams.

Rhoda Williams, the wife of the first witness and sister of the deceased, was the next witness for the State. The substance of her narrative was the same as that of her husband, with this addition: "About four or five o'clock on that evening, before he was killed, my brother was at our house. Alice Williams and Alice Brooks, the deceased's wife, Mary Brooks, his sister, and Amanda, William Usher's wife, were also there. The deceased remained there some time. He brought a satchel with him for his little boy's clothes, which were at my house. While there he and his wife Alice went a short distance to a house in which they had previously lived together, after the little boy's stockings.

"The deceased, Ben. Brooks, came back in a little while, and his little sister carried the satchel containing the boy's clothing to him at the gate, and the deceased and his sister, Alice Williams, started home, their road laying together for some distance. The deceased was carrying Alice's baby when they left.

"While Ben. Brooks was at my house that evening, he had out a knife with which he cut some tobacco to put in his pipe. It was a brown handled pocket knife, smaller at the ends than in the middle. I would know the knife if I were to see it. I have never seen it since. He also had five dollars in money in his money purse, and something which he called his 'jack' in a little leather case about as long as my finger."

Mary Brooks, sister of the deceased, was the next witness for the State. Her testimony was, in substance, the same as that of Henry and Rhoda Williams, with the exception that she did not see the deceased with any money or a "jack" at Rhoda Williams's house, on the evening he was killed, but saw him with a knife, tobacco and a pipe.

Alice Williams, the half-sister of the deceased, next testified for the State, and her narrative was similar to that of Rhoda Williams as to what transpired at Rhoda's house that evening at five o'clock, except that she did not see the deceased have any money or anything he called his "jack." She was not at Rhoda's

house that night at dark, when the defendant went there and told that he had shot Ben. Brooks.

Manuel Johnson testified, for the State, that he was in no way related to any of the parties figuring in this case. He was at the house of Henry Williams on the evening and the night of the killing of Brooks. The defendant came to Henry Williams's house while the witness was there, and called to Rhoda Williams, and told her that he had shot her brother, Ben. Brooks, down on the Lake prairie road, and that she had better go and look after him. Defendant then went to William Usher's house, about two hundred yards distant. This occurred about dark. The defendant did not say why he killed the deceased. After hearing this, the witness went home.

Alice Brooks, the widow of the deceased, was the next witness for the State. She testified that, at the time of the death of her husband, he and she had not lived together for two or three months, but expected to live together again. The witness was at the Rhoda Williams house on the evening of the killing, and gave, in substance, the same account of what transpired there as that given by Rhoda Williams. She stated further that, after the separation of herself and husband, the defendant "went with her several times, and was paying her some attention." The killing occurred on Saturday night, or evening, after five o'clock. On Friday, the previous night, Bob Jackson gave a sociable at his house in the neighborhood, which was attended by quite a number. Lemonade and other refreshments were on sale. The defendant invited the witness and another woman to drink lemonade. Just as the party finished drinking the lemonade, the deceased came up and entered into conversation with the witness. While this talk was going on, the defendant called to the witness: "Come on, let's promenade." The deceased said to him: "Wait until I get through." The defendant said to the deceased: "What sort of a dog-gone way is this you have of doing? You quit a woman, and then keep dogging after her." They had some words, went out of doors, and the witness saw no more.

Willis Pano, for the State, testified that he was at the Bob Jackson party on Friday night before the Saturday of the killing. The defendant and the deceased had some words about the wife of the deceased, and the two went out of doors. The deceased, during the quarrel, called the defendant a son of a b—h, to which the defendant replied: "I will take that off you, because

I do not know any better about it; but I will go to town to-morrow and see if you are divorced from Alice, and if you are, you had as well be as dead as a log."

George W. Crawford testified, for the State, that he was constable of precinct number one, Colorado county, Texas, and, as such, he summoned a jury of inquest, and, with them, went to the body of Ben. Brooks, which he found lying on the road in Lake prairie. This was on the night of the killing.

At about three o'clock on the evening of the killing, the defendant came to the witness at his office in Columbus, and asked him if Ben. Brooks had got a divorce from Alice Brooks. The witness replied that he had not, and the defendant asked when he would get a divorce. The witness replied that he would get it at the March term of the District Court. The defendant then said: "Ben. Brooks and I had a fuss last night." Witness asked him about the difficulty, and the defendant replied: "You will hear from me soon, and I will have something to tell you." Witness asked: "Why can't you tell me now?" He replied: "Well, it is all about a woman, and you will hear from me again." This occurred on the evening of the killing of Brooks.

When the witness got to the body he found that Brooks had been shot through the muscle of the left arm, the ball passing into the left side. A satchel was under his head, and appeared to have been placed there by some one. Witness found nothing on the body but a leather pouch. It was possible that the body was searched by some one before the witness arrived.

Dick Beason, the defendant's step-father, testified, for the State, that he lived on George Perry's place, some two miles from the Pinchback quarters, where the defendant lived. About three o'clock on the evening of the killing the defendant came to the house of the witness and asked if the witness objected to his shooting off his pistol and reloading it. The witness replied that he had no objections, and the defendant discharged his pistol twice. The witness did not know what he did after firing the two shots.

C. E. Crarey, for the State, testified that he was one of the jury of inquest called by Mr. Crawford to view the dead body of Ben. Brooks. He examined the body carefully, and found no powder burns about it. The ball passed straight through the muscle of the left arm, and went straight into the left side. From the examination made, it appeared to the witness that the

left arm of the deceased was hanging straight down by his side at the time the shot was fired.

J. L. Townsend testified, for the State, that he was the sheriff of Colorado county. He made diligent search for the defendant after the killing of Ben. Brooks, but failed to find him. The State closed.

William Usher was the first witness for the defense. He testified that he and the defendant were half-brothers. They were together in the town of Columbus on the day that Brooks was killed. The witness saw the defendant at the auction store in that town between three and four o'clock, when the defendant started home. The witness remained in town later, and did not reach home until about dark that night. The defendant was not at home when the witness arrived, but the witness's wife informed the witness that he had been there. In a few minutes the defendant came to the house. The witness met him at the gate, when he said to the witness: "Brother, as I was coming home a while ago, Ben. Brooks met me in the road and said to me, ' How about our fuss of last night?' and I said to him: ' It is all over with me—that I did not want to have anything more to do with it;' when Ben. said: ' Well, by G—d, it's not all over with me!' and rushed on me with his knife drawn, and was in the act of cutting me, when I shot him." He said to the witness that he would not have shot Ben. had he not been compelled to do so to save his own life. Defendant then left the witness's house on foot. He was living with and picking cotton for the the witness at the time.

Mandy Usher testified, for the defendant, that she was his sister-in-law. She was at Rhoda Williams's house on the evening that Ben. Brooks was killed. She was there when Ben. Brooks came to the house, was there all the time that he was, and was there for some time after he left. She did not see Brooks have a pocket book out at the house, nor did she hear him say anything about his "jack." Had anything of this nature occurred, the witness was positive that she would have seen and heard it. Nothing of the kind occurred. She saw him with a knife, which she described, some tobacco and a pipe. The witness was here shown a knife, which she declared looked very much like the knife used by Brooks that evening in cutting tobacco. If it was not the same knife it looked very much like it.

The witness lived about one hundred and fifty yards from Rhoda Williams's house. After she went home that evening,

and at about good dusk, the defendant rode up to her gate, and said to her that on his way home that evening from Mr. Hester's quarters, he met Ben. Brooks and had to shoot him; that he would not have done so had he not been compelled, in order to save his own life; that Brooks was rushing on him with an open knife drawn. This was before William Usher, the husband of the witness, got home. The defendant then left the house, but returned in a short time. Meantime the husband of the witness got home, and met the defendant at the fence, where they talked for some time. Shortly the defendant left on foot, and the witness saw no more of him for some time.

William Glover testified, for the defendant, that he lived on Mr. Hester's plantation. He saw the defendant at Mr. Hester's quarters, "running on" with the hands on the evening that Brooks was killed. Defendant left Hester's quarters about dusk to go to William Usher's, where he lived. In going from Hester's to Usher's, the defendant would have had to travel the road upon which the body of Ben. Brooks was found. The body was found about five or six hundred yards from Hester's, and about one mile from Usher's house.

Jake Stephens testified, for the defense, that he was at the supper on Mr. Pinchback's place on the night before the killing. He saw the defendant and the deceased there, and heard the controversy between them. He heard the deceased call the defendant a d—d son of a b—h, two or three times. He heard the defendant reply: "Well, Ben., I will take that off of you, because I don't know any better." The witness was present all of the time and did not hear the defendant make any threats of any kind against the deceased.

Sumpter Lewis testified, for the defendant, that he went with others to where the body of Books lay after he was killed. About three months before this trial, while he was going from one plantation to another, he had occasion to pass near the place where the body was found. Near where the body was found, the witness found the knife which was exhibited to Mandy Usher. He found it in a wagon rut, with the large blade open. The road where the knife was found was a road over which cotton had been hauled. Asa Johnson was with him when he found the knife.

Asa Johnson testified, for the defense, that he was with Sumpter Lewis when the latter found the knife exhibited in court.

Lewis found the knife on the edge of a wagon rut, on the road leading from Hester's farm to Pinchback's, in Lake prairie.

George Best testified, for the defense, that he was deputy sheriff of Colorado county. Some two weeks after the defendant was charged with the murder of Ben. Brooks, he came to the jail and surrendered. Defense closed.

Rhoda Williams was re-called by the State in rebuttal. She testified that she would know the knife Brooks had at her house on the evening he was killed. The knife exhibited, and said to have been found by Sumpter Lewis, is not the knife Brooks had at her house on that evening.

The motion for a new trial raised the questions treated in the opinion.

*McCormick & Logue* filed an able brief for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. In this case there is no dispute as to the proof of the *corpus delicti.* It was proved, and not denied, that defendant committed the homicide, but it was claimed by defendant upon the trial that in committing the deed he acted in self-defense. This was the vital issue in the case. There was no witness to the killing, the defendant and deceased being alone at the time. Soon after the killing the defendant informed persons of it, and stated that he had shot the deceased; that he did not want to shoot him, but was compelled to do so to save his own life, as the deceased was at the time rushing upon him with a drawn knife, and was in the act of cutting him. This being the defense, the defendant offered witnesses to prove that the deceased was a man of violent temper and disposition, and known in his neighborhood as being quarrelsome and frequently engaged in fights and broils, and that such was the general character of the deceased. Upon objection made by the prosecution, this proposed evidence was rejected by the court, and this action of the court is presented by a bill of exceptions, and assigned as error.

In *Creswell* v. *The State (ante,* page 1), decided by this court at its present term, it was said: "Threats made by deceased, and the dangerous character of the deceased, are only admissible where it is shown that, at the time of the homicide the deceased did some act indicating his purpose then to take the life of the

defendant, or do him some serious bodily harm, or when the circumstances of the case raise a doubt in regard to the question whether the accused committed the homicide in self-defense." In that case it was held that there was nothing in the evidence which rendered the testimony offered to prove the violent and dangerous character of the deceased admissible, and the ruling of the trial court in rejecting such evidence was held by this court to be correct. This decision, however, was based upon the sole ground that the facts and circumstances of the case did not show "that at the time of the homicide the deceased was doing any act indicating a purpose to kill or injure the defendant, or tending to show that the homicide was committed in self-defense."

In the case now before us, the facts proved are different. Here there is testimony which, if believed, establishes justifiable homicide, or at least reduces the homicide to a lower grade than murder in the first degree. It is not for us, and it was not for the trial judge, to consider the weight of this testimony. That was a matter solely and exclusively within the province of the jury. Being the statement of the defendant, it might be entitled, standing alone, to but little weight, if any whatever. On the other hand, if it were corroborated by other facts and circumstances in evidence, it might be entitled to much weight. Be this as it may, the evidence was before the jury for their consideration, and they alone could pass upon its credibility and probative force. Such being the state of case, the defendant, in support of his plea of self-defense, proposed to prove the violent and dangerous character of the deceased. He offered this as a circumstance in corroboration of his own statement already in evidence, that he had committed the homicide to save himself from a dangerous and deadly attack then being made upon him by the deceased. Was he entitled to place this evidence before the jury?

We think this question is settled in the affirmative by the leading case of *Horbach* v. *The State*, 43 Texas, 242, wherein the authorities are elaborately reviewed, and the conclusions to which they lead stated as follows: "It may be deduced from these authorities that the general character of the deceased for violence may be proved when it would serve to explain the actions of the deceased at the time of the killing; that the actions which it would serve to explain must first be proved before it would be admissible as evidence; that if no such acts were

proved as it would serve to explain, its rejection, when offered in evidence, would not be error; and that if rejected when a proper predicate has been established for its admission, it is held to be error. This results in what has previousl᠎ ᠎ttempted to be developed, that the general character of the deceased for violence should be allowed to be proved, not as a substantive fact, in whole or in part abstractly constituting a defense, but as auxiliary to and explanatory of some fact or facts proved to have occurred at and in connection with the killing, which tend to establish a defense when thereby aided by furnishing reasonable ground for the belief on the part of the slayer that he is then in immediate and imminent danger of the loss of his life from the attack of his assailant. It is observable in most of these cases that it is said that the evidence of character for violence is admissible in a doubtful case. It can hardly be meant by this that it is admissible only in a doubtful case of guilt; for if that is doubtful, there is no need of proof of character or anything else to help out the defense. The explanation, it is submitted, is that the person killing is presumed to have committed murder by the act of killing; and in arraying the facts to establish that he acted in self-defense, if an act of the deceased at the time of the killing is of doubtful import, or is otherwise of a character that it would be explained more favorably for the accused by adding to it the proof of the character of the deceased for violence, then such proof is admissible."

These conclusions announced in the Horbach case are abundantly sustained by American authorities. Mr. Wharton, in his excellent work on Criminal Evidence, treats this subject exhaustively, reviewing both the English and American decisions, and concludes as follows: "Taking the authorities as a whole, therefore, we may hold that it is admissible for the defendant, having first established that he was assailed by the deceased, and in apparent danger, to prove that the deceased was a person of ferocity, brutality, vindictiveness, and of excessive strength; such evidence being offered for the purpose of showing either, 1, that the defendant was acting in terror, and hence incapable of that specific malice necessary to constitute murder of the first degree; or 2, that he was in such apparent extremity as to make out a case of self-defense; or 3, that the deceased's purpose in encountering the defendant was deadly." (Whart. Crim. Ev., secs. 69–84.)

And Mr. Bishop says: "Where the defendant, to excuse or

mitigate his acts, claims that they were in self-defense or passion, the particulars of the transaction being thus material, and the law judging him by the facts and necessities as they *appeared to him*, whatever they truly were, he may give in evidence anything known to him of the character, prior conduct, threats, or other utterances of the person with whom he was contending, which, not as showing that the man was bad, but that in the special instance and circumstances he was dangerous, might reasonably have place among the considerations guiding his actions." (2 Bish. Cr. Proc., sec. 610.)

It is needless to multiply authorities upon this question. We consider it conclusively settled that, in a trial for homicide, where there is evidence tending to show that in committing the homicide the defendant acted in self-defense, or under the reasonable apprehension that his life was in danger, or that he was in danger of serious bodily harm, by reason of some act of deceased then done indicating an intention to kill or do serious bodily harm, or that he acted under the influence of passion without deliberation, he is entitled to prove, in explanation, extenuation or justification of his acts, the general character of the deceased as being that of a violent and dangerous man, or his general character in any other respect which would tend to determine the grade of the homicide by showing the intent actuating the defendant in its commission.

Under the facts in this case, we are clearly of the opinion that the defendant was entitled to prove that the general character of the deceased was that of a violent and dangerous man, and that the court erred in rejecting the offered evidence. Whether or not such evidence, if it had been admitted, would have probably changed the result of the trial, is not for this or any other court to determine. It was a matter to be considered alone by the jury, and it was the defendant's right that it should go to the jury for their consideration in connection with the other evidence, it being both pertinent and material.

Several objections are made by defendant's counsel to the charge of the court. As the judgment of conviction must be reversed because of the error hereinbefore noticed, it is not necessary that we should consider the alleged errors in the charge of the court. Therefore, without either approving or disapproving the portions of the charge excepted to, we will only say that in connection with, and as a portion of the charge upon the law of self-defense, we think, in view of the evidence in this

case, the court should have charged that a person who is unlawfully and violently attacked by another, under circumstances which would, in law, make the homicide of the assailant justifiable, is not bound to retreat in order to avoid the necessity of killing his assailant. (Penal Code, Arts. 571, 572 and 573.)

Another question is presented by the record, in relation to the action of the court in refusing to receive the first verdict returned by the jury, because it was not responsive to the charge of the court, and in receiving the corrected verdict. As this question is not likely to recur in another trial of the cause, it is unnecessary that we should now determine it. It will be the time to investigate and decide it, when it becomes necessary to the disposition of a case.

Because of the error of the court in rejecting the proposed testimony to prove the general character of deceased, and because of the further error in the charge of the court which we have specified, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered April 28, 1883.